# EXHIBIT C

**RENTAL AGREEMENT**

DATED AS OF JANUARY 1, 2024

BY AND BETWEEN

DECATUR COUNTY-BAINBRIDGE INDUSTRIAL DEVELOPMENT AUTHORITY

AND

SAFER HUMAN MEDICINE, INC.

Certain interests of the Decatur County-Bainbridge Industrial Development Authority ("Issuer") in this Rental Agreement and all rents, revenues and receipts hereunder have been assigned to the owner of the Bond (as defined herein) pursuant to a Bond Resolution adopted by the Issuer.

TABLE OF CONTENTS
(THIS TABLE OF CONTENTS IS NOT A PART OF THIS RENTAL AGREEMENT
AND IS ONLY FOR CONVENIENCE OF REFERENCE)

**ARTICLE I      DEFINITIONS AND RULES OF CONSTRUCTION** ..........................................1
   SECTION 1.1         DEFINITIONS .......................................................................................1
   SECTION 1.2         RULES OF CONSTRUCTION...................................................................1

**ARTICLE II     REPRESENTATIONS** ...............................................................................5
   SECTION 2.1         REPRESENTATIONS OF THE ISSUER.......................................................5
   SECTION 2.2         REPRESENTATIONS OF THE COMPANY ..................................................6

**ARTICLE III    RENTAL OF THE PROJECT**.......................................................................7
   SECTION 3.1         RENTAL OF THE PROJECT ....................................................................7
   SECTION 3.2         WARRANTIES ....................................................................................8
   SECTION 3.3         QUIET ENJOYMENT ...........................................................................8

**ARTICLE IV     COMMENCEMENT AND COMPLETION OF THE PROJECT; ISSUANCE
OF THE BOND** ........................................................................................................8
   SECTION 4.1         AGREEMENT TO ISSUE THE BOND; APPLICATION OF BOND PROCEEDS .............8
   SECTION 4.2         AGREEMENT TO DEVELOP THE PROJECT .............................................8
   SECTION 4.3         LIENS ...............................................................................................9
   SECTION 4.4         DISBURSEMENTS OF BOND PROCEEDS .................................................9
   SECTION 4.5         USE OF PROJECT ..............................................................................10
   SECTION 4.6         ESTABLISHMENT OF COMPLETION DATE; MONEYS REMAINING .....................10
   SECTION 4.7         ISSUER NOT LIABLE IN EVENT BOND PROCEEDS INSUFFICIENT .....................10
   SECTION 4.8         COMPANY AND ISSUER REPRESENTATIVES AND SUCCESSORS ......................10
   SECTION 4.9         INVESTMENT OF MONEYS IN FUNDS.....................................................11

**ARTICLE V      RENTAL AND POSSESSION** ......................................................................11
   SECTION 5.1         EFFECTIVE DATE OF THIS AGREEMENT; DURATION OF TERM ....................11
   SECTION 5.2         DELIVERY AND ACCEPTANCE OF POSSESSION...................................12
   SECTION 5.3         PAYMENT OF RENTS ..........................................................................12
   SECTION 5.4         PLACE OF PAYMENTS.........................................................................13
   SECTION 5.5         OBLIGATIONS OF COMPANY UNCONDITIONAL .....................................13

**ARTICLE VI     IMPROVEMENTS AND MODIFICATIONS; TAXES AND
INSURANCE**..........................................................................................................13
   SECTION 6.1         IMPROVEMENTS AND MODIFICATIONS OF PROJECT BY COMPANY.................13
   SECTION 6.2         REMOVAL OF EQUIPMENT ..................................................................14
   SECTION 6.3         TAXES, OTHER GOVERNMENTAL CHARGES AND UTILITY CHARGES ...............14
   SECTION 6.4         SPECIAL COVENANTS RELATED TO AD VALOREM TAXATION .........................15
   SECTION 6.5         [RESERVED] .....................................................................................15
   SECTION 6.6         INSURANCE REQUIRED.......................................................................15
   SECTION 6.7         CONDUCT OF BUSINESS......................................................................15
   SECTION 6.8         RIGHT OF INSPECTION .......................................................................16
   SECTION 6.9         REPAIR AND MAINTENANCE...............................................................16
   SECTION 6.10        DEPRECIATION, COST RECOVERY AND INVESTMENT CREDIT.........................16

**ARTICLE VII    DAMAGE AND DESTRUCTION** ...................................................................17
   SECTION 7.1         DAMAGE AND DESTRUCTION...............................................................17
   SECTION 7.2         CONDEMNATION...............................................................................17

**ARTICLE VIII   SPECIAL COVENANTS**............................................................................18

| SECTION 8.1 | COMPANY TO MAINTAIN ITS EXISTENCE; CONDITIONS UNDER WHICH EXCEPTIONS PERMITTED | 18 |
| SECTION 8.2 | RELEASE AND INDEMNIFICATION OF THE ISSUER | 18 |
| SECTION 8.3 | COMPANY'S PERFORMANCE UNDER THE BOND RESOLUTION | 19 |
| SECTION 8.4 | FURTHER ASSURANCES AND CORRECTIVE INSTRUMENTS | 19 |
| SECTION 8.5 | INDEMNITY AGAINST EXPENSES | 20 |
| | | |
| ARTICLE IX | ASSIGNMENT, SUBLETTING, PLEDGING AND SELLING; REDEMPTION | 20 |
| SECTION 9.1 | ASSIGNMENT OF AGREEMENT BY THE COMPANY | 20 |
| SECTION 9.2 | SUBLETTING | 21 |
| SECTION 9.3 | ASSIGNMENTS OF THIS AGREEMENT OR SALE OF PROJECT BY THE ISSUER; CONSOLIDATION OR MERGER OF ISSUER | 21 |
| SECTION 9.4 | REDEMPTION OF BOND AT REQUEST OF COMPANY | 21 |
| | | |
| ARTICLE X | EVENTS OF DEFAULT AND REMEDIES | 21 |
| SECTION 10.1 | EVENTS OF DEFAULT DEFINED | 21 |
| SECTION 10.2 | REMEDIES ON DEFAULT | 22 |
| SECTION 10.3 | NO REMEDY EXCLUSIVE | 23 |
| SECTION 10.4 | AGREEMENT TO PAY ATTORNEYS' FEES AND EXPENSES | 23 |
| SECTION 10.5 | NO ADDITIONAL WAIVER IMPLIED BY ONE WAIVER | 23 |
| SECTION 10.6 | WAIVER OF APPRAISEMENT OR VALUATION | 23 |
| | | |
| ARTICLE XI | MISCELLANEOUS | 23 |
| SECTION 11.1 | IMMUNITY OF DIRECTORS, MEMBERS, OFFICERS AND EMPLOYEES OF ISSUER | 23 |
| SECTION 11.2 | CAPTIONS | 24 |
| SECTION 11.3 | NOTICES | 24 |
| SECTION 11.4 | ESTOPPEL CERTIFICATES | 24 |
| SECTION 11.5 | BINDING EFFECT | 25 |
| SECTION 11.6 | SEVERABILITY AND GOVERNING LAW | 25 |
| SECTION 11.7 | AMOUNTS REMAINING IN FUNDS | 25 |
| SECTION 11.8 | AMENDMENTS, CHANGES AND MODIFICATIONS | 25 |
| SECTION 11.9 | EXECUTION IN COUNTERPART | 25 |
| SECTION 11.10 | NET RENTS | 25 |
| SECTION 11.11 | TIME OF THE ESSENCE | 25 |
| SECTION 11.12 | THE RIGHTS OF THE ISSUER | 25 |
| SECTION 11.13 | NO LIABILITY OF ISSUER; NO CHARGE AGAINST ISSUER'S CREDIT | 26 |

## EXHIBITS

EXHIBIT A    Property Description
EXHIBIT B    Description of the Project
EXHIBIT C    Form of Requisition and Advance Request
EXHIBIT D    PILOT Payments Schedule

**THIS RENTAL AGREEMENT** ("Agreement") is dated as of January 1, 2024, between the **Decatur County-Bainbridge Industrial Development Authority**, a public body corporate and politic existing under the laws of the State of Georgia ("Issuer"), and **Safer Human Medicine, Inc.**, a Delaware corporation duly organized and existing, and its successors and assigns ("Company").

## W I T N E S S E T H:

**WHEREAS**, the Issuer and the Company desire to provide the terms of the development and rental of the Project (as hereinafter defined) and to provide certain additional covenants and agreements;

**NOW, THEREFORE**, in consideration of the respective representations and agreements hereinafter contained, the Issuer and the Company agree as follows (provided, that in the performance of the agreements of the Issuer herein contained, any obligation it may thereby incur for the payment of money shall not be a general debt, liability or obligation of it or a debt, liability or obligation of the State of Georgia (the "State") or any political subdivision thereof, or the Issuer, but shall be payable solely out of the revenues derived from the Issuer's ownership and renting of the Project):

## ARTICLE I

### DEFINITIONS AND RULES OF CONSTRUCTION

Section 1.1 Definitions. In addition to the terms defined in the Bond Resolution and the Project Agreement, which shall have the same meanings when used in this Agreement, the following terms shall have the meanings set forth below.

"**Act**" means the Constitution and laws of the State, including specifically, but without limitation, that certain amendment to the Constitution of the State, 1968 Ga. Laws 1780, as amended by 1981 Ga. Laws 3482 and as continued by 1985 Ga. Laws 3930 (collectively, "Act"), and, if and to the extent applicable, the Development Authorities Law of the State (O.C.G.A. § 36-62-1, et seq.), as amended.

"**Additional Rent**" means the payments required to be made by the Company pursuant to Section 5.3(b) and 5.3(c) hereof.

"**Adequate Financial Assurance**" means a guaranty of payment of the rent and other financial obligations of the Company under this Agreement, including, without limitation, the indemnity obligations of the Company, made by a Qualified Real Estate Investor or Institutional Investor for the period of time that the proposed assignee is the Company under this Agreement.

"**Advance**" shall have the meaning ascribed to such term in the Bond Purchase Agreement.

"**Affiliate**" means any Person, firm, or corporation that, directly or indirectly, controls, is controlled by or is under common control with the Company.

"**Agreement**" has the meaning set forth in the introductory paragraph.

"**Approved Assignee**" means a Person that qualifies for an Exempt Assignment (defined below).

"**Basic Rent**" means the payments required to be made by the Company pursuant to Section 5.3(a) hereof.

"**Bond Resolution**" means the Bond Resolution adopted by the Issuer on December 11, 2023, including any bond resolution supplemental thereto, pursuant to which (a) the Bonds are authorized to be issued, and (b) the Issuer's interest in this Agreement (except Reserved Rights (as defined in the Bond Resolution)) and the additional Security identified in the Bond Resolution, are pledged as security for the payment of principal of and interest on the Bonds.

"**Company**" has the meaning set forth in the introductory paragraph.

"**Completion Date**" means the date certified as provided in Section 4.6 hereof.

"**Cost(s) of the Project**," "**Cost**," or "**Costs**" means all costs that the Issuer or the Company may properly pay for the Project and which, under generally accepted accounting principles, are chargeable to the capital account of the Project or could be so charged either with a proper election to capitalize such costs or, but for a proper election, to expense such costs, including (without limitation) the following costs:

(a)       Fees and expenses incurred in preparing plans and specifications for the Project (including preliminary study or planning or any aspect thereof); the costs of any labor, services, materials and supplies used or furnished in site improvement and construction; preparation for or installation of any Equipment; the costs of any Equipment for the Project; any acquisition necessary to provide utility services or other services, including, but not limited to, costs to provide the Project with public transportation facilities, roadways, parking lots, water supply, sewage and waste disposal facilities; and the costs of all real and tangible personal property deemed necessary by the Company and acquired in connection with the Project;

(b)       The fees for engineering, supervisory and consulting services;

(c)       Any fees and expenses incurred in connection with perfecting and protecting title to the Project and any fees and expenses incurred in connection with preparing, recording, or filing such documents, instruments, or financing statements as either the Company or the Issuer may deem desirable to perfect or protect the rights of the Issuer under the Bond Documents;

(d)       Legal, accounting or financing advisory fees and expenses, any fees and expenses of the Issuer or the Company, filing fees incurred in connection with the authorization, issuance, sale and purchase of the Bonds and the preparation of the Bond Documents and all other documents in connection with the authorization, issuance, and sale of the Bonds; and

(e)       Any other costs and expenses relating to the Project which could constitute costs or expenses for which the Issuer may expend proceeds of the Bonds (whether derived directly or indirectly from the issuance of the Bonds) under the Act.

"**Environmental Laws**" means all federal, state, and local laws, rules, regulations, ordinances, programs, permits, guidance, orders, and consent decrees relating to health, safety, and environmental matters, including, but not limited to, all current Environmental Laws as of the date hereof, or as those Environmental Laws may be amended, revised or superseded, of any governmental authority having jurisdiction over the Project addressing pollution or the protection of human health or the environment, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. § 1251, et seq.; the Clean Air Act, 42 U.S.C. § 7401, et seq., the toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; the Oil Pollution Act, 33 U.S.C. § 2701, et seq., the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001, et seq.; the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; and all similar laws (including implementing regulations) of any governmental authority having jurisdiction over the Project or its acquisition by the Company.

"**Equipment**" means those items of machinery, equipment and other items of personal property acquired or permitted herein to be acquired and installed as part of the Project with proceeds from the sale of the Bonds, constituting part of the Project generally described in Exhibit B attached hereto and made a part hereof by this reference, and more particularly described by the Requisitions submitted from time to time pursuant to Section 4.4 hereof, together with any item of machinery and equipment and related property acquired and installed in substitution therefor or in addition thereto pursuant to the provisions of Sections 6.2 and 7.1 hereof, less such property as may be released from this Agreement pursuant to Section

6.2 hereof, all as they may at any time exist, but not including the Company's own machinery and equipment installed under the provisions of Section 6.1 hereof.

"**Event of Default**" means those events specified in and defined by Section 10.1 hereof.

"**Exempt Assignment**" means any of the following assignments: (1) Any bona fide Mortgage or Leasehold Mortgage; (2) the acquisition by any Mortgagee or Leasehold Mortgagee or its designee of the Company's interest in this Agreement through the exercise of any right or remedy of such Mortgagee or Leasehold Mortgagee under a bona fide Mortgage or Leasehold Mortgage, including any assignment of the Company's interest in this Agreement to a Mortgagee or the Leasehold Mortgagee or its designee made in lieu of foreclosure; (3) any foreclosure sale by any Mortgagee or Leasehold Mortgagee pursuant to any power of sale contained in a bona fide Mortgage or Leasehold Mortgage; (4) any sale or assignment of the Company's interest in this Agreement by any Mortgagee or Leasehold Mortgagee (or its designee) which has acquired the Company's interest in this Agreement by means of any transaction described above; (5) any sale or assignment of the Company's interest in this Agreement to any Qualified Real Estate Investor; (6) Any sale or assignment of the Company's interest in this Agreement to any person if (a) the proposed assignee provides Adequate Financial Assurance of the payment of rent and other financial obligations under this Agreement for the period the proposed assignee is the lessee under this Agreement, and (b) the proposed assignee has sufficient commercial real estate experience to properly manage, or oversee the management of, the Project; and (7) any sale or assignment of the Company's interest in this Agreement to an Affiliate of the Company having net worth reasonably acceptable to the Issuer.

"**Governmental Authority**" means the United States, any state of the United States and any county, city, or political subdivision thereof and any board, bureau, council, commission, department, agency, court, legislative body or other instrumentality of the United States, any state of the United States or any county, city, or political subdivision thereof.

"**Grant Documents**" has the meaning set forth in Section 4.4 hereof.

"**Grant-Funded Assets**" has the meaning set forth in Section 4.4 hereof.

"**Initial Term**" has the meaning set forth in Section 5.1 hereof.

"**Institutional Investor**" means any of the following persons: (i) Any savings bank, savings and loan association, commercial bank, or trust company having shareholder equity (as determined in accordance with GAAP accounting) of at least $50,000,000; (ii) Any college, university, credit union, trust or insurance company having assets of at least $50,000,000; (iii) Any employment benefit plan subject to ERISA having assets held in trust of $50,000,000 or more; (iv) Any pension plan established for the benefit of the employees of any state or local government, or any governmental authority, having assets of at least $50,000,000; (v) Any limited partnership, limited liability company, corporation or other investment entity having either (A) total assets under ownership or management of at least $50,000,000, or (B) committed capital of at least $50,000,000; (vi) Any corporation, limited liability company or other Person having shareholder equity (or its equivalent for non-corporate entities) of at least $50,000,000; (vii) Any lender of substance which performs real estate lending functions similar to any of the foregoing, and which has assets of at least $50,000,000; and (viii) Any partnership having as a general partner or as an investor limited partner any person or entity described above, or any corporation, limited liability company or other person or entity controlling, controlled by or controlled with any person or entity described above.

"**Land**" means the real property described in Exhibit A attached hereto and made a part hereof by this reference, and rented to the Company hereunder, or such other real property in the jurisdiction of the Issuer as may be provided by amendment hereto.

"**Leasehold Mortgage**" means any leasehold mortgage, leasehold deed to secure debt, or similar instrument pursuant to which the Company pledges its interest in this Agreement to a Lender.

3

"**Leasehold Mortgagee**" means a holder of a Leasehold Mortgage.

"**Lender**" means any financial institution which has advanced credit to the Company with respect to the Project, its successors, and assigns.

"**Loan Documents**" means the loan documents with respect to the Company's Leasehold Mortgage or a Superior Security Document, as appropriate.

"**Mortgage**" means, as a noun, any Superior Security Document, Leasehold Mortgage or any other deed of trust, mortgage, deed to secure debt, security agreement or similar voluntary agreement creating a Lien upon or security interest in or conveying title to the Project or any part thereof or any interest therein (including without limitation the Company's interest in this Agreement) as security for a debt or other obligation. As a verb, "Mortgage" means to grant any such a deed of trust, mortgage, deed to secure debt, security agreement or similar voluntary agreement creating a Lien upon or security interest in or conveying title to the Project or any part thereof or any interest therein (including without limitation the Company's interest in this Agreement) as security for a debt or other obligation.

"**Mortgagee**" means the holder of a Mortgage.

"**Net Proceeds**," when used with respect to any insurance (including title insurance) or condemnation award, means the gross proceeds from the insurance or condemnation award remaining after payment of all expenses incurred in the collection of such gross proceeds.

"**Paying Agent**" means any paying agent at the time serving as such under the Bond Resolution.

"**Permitted Encumbrances**" means those liens, encumbrances, restrictions on use, easements, rights of way and other matters affecting ownership or title (i) existing on the date of delivery hereof, (ii) described in any policy of title insurance that may be procured by the Company, (iii) unfiled and inchoate mechanics' and materialmen's liens for construction work in progress, (iv) architects', contractors', subcontractors', mechanics', materialmen's, suppliers', laborers' and vendors' liens or other similar liens not then payable, (v) utility, access and other easements, licenses, rights-of-way, restrictions, reservations and exceptions which, according to a certificate of an authorized representative of the Company (designated by the Company to the Issuer from time to time) delivered to the Issuer, are necessary for the construction of the Project and which will not materially interfere with or impair the operations, if any, being conducted at the Project, (vi) caused to come into effect by the Company or consented to by the Company in writing from time to time, with the consent of the Issuer, which consent shall not be unreasonably withheld, conditioned or delayed, (vii) any Lien that secures indebtedness which financed or refinanced costs of the Project, (viii) any Leasehold Mortgage; and (ix) any Superior Encumbrances..

"**Permitted Investments**" means any one or more of the following investments, if and to the extent the same are then legal investments under the applicable laws of the State for the moneys proposed to be invested therein:

(a)     The bonds or obligations of any county, municipal corporation, school district or other political subdivision of the State, or any authority, or other public body corporate and politic created under the Constitution and laws of the State, or bonds or obligations of the State or of other counties, municipal corporations, and political subdivisions of the State;

(b)     The bonds or other obligations of the United States Government or of subsidiary corporations of the United States Government fully guaranteed by such government;

(c)     Obligations of agencies of the United States Government issued by the Federal Land Bank, the Federal Home Loan Bank, the Federal Intermediate Credit Bank, and the Central Bank for Cooperatives;

4

(d)     The bonds or other obligations issued by any public housing agency or municipality in the United States, which such bonds or obligations are fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States Government, or project notes issued by any public housing agency, urban renewal agency or municipality in the United States and fully secured as to payment of both principal and interest by a requisition, loan or payment agreement with the United States Government;

(e)     Certificates of deposit of national or state banks located within the State which have deposits insured by the Federal Deposit Insurance Corporation (including certificates of deposit of any bank acting as depository or custodian for any such funds); provided, however, that the portion of such certificates of deposit in excess of the amount insured by the Federal Deposit Insurance Corporation, if any, shall be secured by deposit with the Federal Reserve Bank of Atlanta, Georgia, or with any national or state bank located within the State, of one or more of the following securities in an aggregate principal amount equal at least to the amount of such excess: direct or general obligations of the State, obligations of the United States Government or subsidiary corporations included in paragraph (b) above, obligations of the agencies of the United States Government included in paragraph (c) above, or bonds, obligations or project notes of public housing agencies, urban renewal agencies or municipalities included in paragraph (d) above;

(f)     Securities of or other interests in any no-load, open-end management type investment company or investment trust registered under the Investment Company Act of 1940, as from time to time amended, or any common trust fund maintained by any bank or trust company which holds such proceeds as trustee or by an affiliate thereof so long as:

(i)     The portfolio of such investment company or investment trust or common trust fund is limited to the obligations referenced in paragraph (b) of this definition and repurchase agreements fully collateralized by any such obligations,

(ii)     Such investment company or investment trust or common trust fund takes delivery of such collateral either directly or through an authorized custodian,

(iii)     Such investment company or investment trust or common trust fund is managed so as to maintain its shares at a constant net asset value, and

(iv)     Securities of or other interests in such investment company or investment trust or common trust fund are purchased and redeemed only through the use of national or state banks having corporate trust powers and located within the State.

(g)     Interest-bearing time deposits, repurchase agreements, reverse repurchase agreements, rate guarantee agreements or other similar banking arrangements with a bank or trust company having capital and surplus aggregating at least $50,000,000 or with any government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York having capital aggregating at least $50,000,000 or with any corporation which is subject to registration with the Board of Governors of the Federal Reserve System pursuant to the requirements of the Bank Holding Company Act of 1956, provided that each such interest-bearing time deposit, repurchase agreement, reverse repurchase agreement, rate guarantee agreement or other similar banking arrangement shall permit the moneys so placed to be available for use at the time provided with respect to the investment or reinvestment of such moneys; and

(h)     Such other obligations as may at any time be authorized by applicable law.

"**Person**" means a natural person, business organization, public body, or legal entity.

"**PILOT Payments**" shall have the meaning set forth in Section 6.4 hereof.

"**Project**" means the Land and Equipment generally described in Exhibit B attached hereto, and as the same may be more specifically described by the Requisitions made from time to time pursuant to the provisions of Section 4.4 of this Agreement.

"**Project Agreement**" means the Project Agreement, dated December 11, 2023, by and between SAFER HUMAN MEDICINE, INC., the Issuer, and certain other Public Authorities (as defined therein) related to "Project Liberty."

"**Purchase and Sale Agreement**" means the Purchase and Sale Agreement, dated January [], 2024, by and between Safer Human Medicine, Inc., a Delaware corporation and the Issuer related to "Project Liberty" and one or more parcels located in Decatur County, Georgia, containing, in aggregate, approximately [] acres, and generally known as Tax Parcel [], Tax Parcel [], and Tax Parcel [].

"**Qualified Real Estate Investor**" means any of the following: (i) Any Institutional Investor; or (ii) Any person or entity domiciled within the United States of America and having a minimum net worth of $10,000,000 (either itself or in its direct or indirect constituent members or partners), as certified by a reputable firm of certified public accountants, provided such person or entity has sufficient commercial real estate experience to properly manage, or oversee the management of, the Project. (iii) Any partnership having as a general partner any person or entity described in (ii) above, or any corporation, limited liability company or other person or entity controlling, controlled by, or controlled with any person or entity described in (ii) above.

"**Requisition**" means a requisition for an Advance of proceeds of the Bonds submitted pursuant to Section 4.4 hereof, in substantially the form attached on Exhibit C attached hereto.

"**State**" means the State of Georgia.

"**Superior Encumbrances**" means all encumbrances and title exceptions on the Project in existence at the time of the recording of the Security Deed relating to the Project and any encumbrances created by any Superior Security Document.

"**Superior Security Document**" means any deed to secure debt or similar instrument or instruments in which the Company or the Issuer (at the request of the Company), or both, pledges the Project or its interest in this Agreement to a Lender; the Issuer may be a grantor or debtor thereunder, but the Issuer's obligations thereunder shall be non-recourse, except that recourse may be had against Issuer's interest in the Project, other than the Issuer's Reserved Rights.

"**Supplemental Rent**" means the payments required to be made by the Company pursuant to Section 5.3(d) hereof.

"**Term**" shall have the meaning set forth in Section 5.1 hereof.

Section 1.2 Rules of Construction.

(a)      "Herein," "hereby," "hereunder," "hereof," "hereinbefore," "hereinafter" and other equivalent words refer to this Agreement and not solely to the particular portion thereof in which any such word is used.

(b)      Words importing the singular number shall include the plural number and vice versa, and any pronoun used herein shall be deemed to cover all genders.

(c)      All references herein to particular Articles or Sections are references to Articles or Sections of this Agreement, unless otherwise indicated.

(d)      All other terms used herein which are defined in the Bond Resolution shall have the same

meanings assigned them in the Bond Resolution unless the context otherwise requires.

## ARTICLE II

### REPRESENTATIONS

Section 2.1 Representations of the Issuer. The Issuer makes the following representations as the basis for the undertakings on its part herein contained:

(a)     The Issuer is a public body corporate and politic, and public instrumentality of the State, duly created and existing under the provisions of the Act.

(b)     Under the provisions of the Act, the Issuer has the power to enter into the transactions contemplated by this Agreement and to carry out its obligations hereunder. By proper corporate action, the Issuer has been duly authorized to execute and deliver the Bond Documents to which it is a party.

(c)     The Issuer has found and does hereby declare that the issuance of the Bonds, the use of the proceeds from the sale of the Bonds (whether derived directly or indirectly from the issuance of the Bonds) to directly or indirectly finance, in whole or in part, Costs of acquiring, constructing, equipping and installing the Project to promote economic development and job creation and to facilitate a property tax incentive for the Company and the provision of the same to the Company by usufruct and/or bailment for hire and sale of the same to the Company are in furtherance of the public purposes for which the Issuer was created.

(d)     To directly or indirectly finance, in whole or in part, the Costs of the Project, the Issuer proposes to issue the Bonds which will mature, bear interest and be subject to redemption as set forth in the Bond Resolution.

(e)     All actions of the Issuer with respect to the issuance of the Bonds were taken at meetings held after due notice given in accordance with the Issuer's procedures and the provisions of law, which were open to the public and at which a majority of the Issuer's directors or members were present and acting throughout, and said actions appear of public record in the minute books of the Issuer.

Section 2.2 Representations of the Company. The Company makes the following representations as the basis for the undertakings on its part herein contained:

(a)     The Company is a Delaware corporation duly organized and validly existing with authority to conduct business in the State, has power and authority to enter into and to perform the agreements and covenants on its part contained in the Bond Documents to which it is a party and has duly authorized the execution, delivery and performance of the Bond Documents to which it is a party by all necessary actions and proceedings.

(b)     No further authorizations, consents or approvals of governmental bodies or agencies are, to the best of its knowledge, required in connection with the execution and delivery by the Company of this Agreement or in connection with the carrying out by the Company of its obligations under this Agreement, except for authorizations, consents or approvals that need not be obtained at this time.

(c)     The Company has duly executed the Bond Documents to which it is a party, and the Bond Documents to which it is a party constitute the legal, valid, binding, and enforceable obligations of the Company.

(d)     The acquisition, construction, equipping, installing and improvement of the Project, the execution, delivery and performance of the Company's obligations under the Bond Documents to which it is a party and the carrying out of the transactions contemplated on its part by the Bond Documents do not violate the Company's articles of organization or operating agreement, or the laws or Constitution of the

State of Georgia or the State of Delaware, and do not constitute a breach of or a default under any existing court order, administrative regulation or other legal decree or any agreement, indenture, mortgage, lease, note or other instrument to which the Company is a party or by which it or its property is bound and which would have a material adverse impact on the Company's ability to perform its obligations hereunder.

(e)    Except as disclosed to the Issuer in writing, there is no action, suit, proceeding, inquiry or investigation, at law or in equity, before or by any court, public board or body, pending or, to the knowledge of the Company, threatened in writing against or affecting the Company, (i) attempting to limit, enjoin or otherwise restrict or prevent the Company from acquiring, constructing, installing, equipping, financing and improving the Project or operating the Project, (ii) contesting or questioning the existence of the Company or the titles of the present officers of the Company to their offices, or (iii) wherein an unfavorable decision, ruling or finding would (A) adversely affect the enforceability of the Bond Documents to which it is a party, or (B) materially adversely affect the financial condition or results of operations of the Company or the transactions contemplated by the Bond Documents.

(f)    The Company is not in violation of its articles of formation or operating agreement or the laws or the Constitution of the State of Georgia or the State of Delaware and is not in default under any existing court order, administrative regulation or other legal decree, or any agreement, indenture, mortgage, lease, note or other instrument to which it is a party or by which it or its property is bound and which would have a material adverse impact on the Company's ability to perform its obligations hereunder.

(g)    The issuance of the Bonds as contemplated by this Agreement, among other incentives, has induced the Company to construct, acquire, install, equip, improve, and operate the Project within the territory of the Issuer.

(h)    The Company or one or more Affiliates will operate the Project as a "project" within the meaning of the Act until the Bond has been paid in full.

## ARTICLE III

### RENTAL OF THE PROJECT

Section 3.1 Rental of the Project. In consideration of the representations and undertakings of the Company in this Agreement, the Issuer hereby rents the Project to the Company, and the Company hereby rents the Project from the Issuer at the rentals set forth in Section 5.3 hereof, for the Term hereof, and in accordance with the provisions of this Agreement. Notwithstanding any provision hereof to the contrary, it is acknowledged and agreed that this Agreement is intended by the parties hereto to create, and does create, in the Company only a relationship of landlord and tenant between the Issuer and Company, and no estate shall pass out of Issuer. The Company shall have only a usufruct with respect to the real property demised by this Agreement and only a bailment for hire with respect to the personal property demised by this Agreement, not subject to levy and sale and not assignable in whole or in part by the Company, except as expressly provided for herein and in compliance herewith. The usufruct nature of this Agreement results from these factors, among others:

(i)    Limitation on Nature of Company's Use. This Agreement provides that the Project may be used only for the circumscribed and limited purpose of the acquisition, construction, equipping, installation and improvement of certain production and related facilities, and imposes other restrictions on the Company's use of the Project, as set forth in Article IV of this Agreement; thus, the Company does not have the right to use the Project in as absolute a manner as it would have if it were the owner of an estate for years.

(ii)    Interest Not Freely Assignable. Company has no property right in the form of a free right to assign its interest in this Agreement and may not sub-lease the Project without Issuer's consent, as described in ARTICLE 9 hereof, except as otherwise set forth in this Agreement. Any assignment requires

either Issuer's consent or compliance with restrictions and requirements imposed by Issuer in this Agreement on any such potential assignment, as so described. Further, any potential assignee must also acquire the Bond since this Agreement requires that the lessee under this Agreement and the Bondholder must be the same.

      (iii)    <u>Taxes and Governmental Charges</u>. Without usufruct status, Company would be required to pay normal taxes on a taxable leasehold interest in addition to payments in lieu of taxes required by this Agreement, including those listed in Exhibit D hereof.

      (iv)    <u>Purchase Option</u>. The purchase of the Project by Company at the end of the Term is not required by this Agreement. Hence, if the Company does not purchase the Project at the end of the Term, then Issuer would retain title to the Project, SUBJECT TO THE TERMS OF THE OPTION AGREEMENT.

      <u>Section 3.2 Warranties</u>. **EXCEPT TO THE EXTENT EXPRESSLY SET FORTH IN THE PROJECT AGREEMENT AND THE PURCHASE AND SALE AGREEMENT, COMPANY ACKNOWLEDGES THAT THE PROJECT SITE WILL BE PROVIDED TO IT "AS-IS" AND WITH ALL FAULTS. EXCEPT TO THE EXTENT EXPRESSLY SET FORTH IN THE PROJECT AGREEMENT, THE ISSUER HAS NO OBLIGATION TO MAKE REPAIRS, MODIFICATIONS, REPLACEMENTS, OR IMPROVEMENTS TO THE PROJECT SITE, INCLUDING WITHOUT LIMITATION THE UPKEEP, DEMOLITION, REMOVAL, MODIFICATION, OR RELOCATION OF ANY STRUCTURES OR PERSONAL PROPERTY ON THE PROJECT SITE. COMPANY ACKNOWLEDGES AND AGREES THAT EXCEPT AS SPECIFICALLY SET FORTH HEREIN OR IN THE PROJECT AGREEMENT, THE ISSUER DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE PROJECT SITE. EXCEPT AS EXPRESSLY SET FORTH IN THE PROJECT AGREEMENT, THE ISSUER MAKES NO WARRANTY, EITHER EXPRESS OR IMPLIED, AS TO THE CONDITION OF THE PROJECT, OR THE PROJECT SITE, OR THAT EITHER WILL BE SUITABLE FOR THE COMPANY'S PURPOSES OR NEEDS. THE PROJECT SITE SHALL BE PROVIDED TO THE COMPANY IN ALL CASES SUBJECT TO PERMITTED ENCUMBRANCES.**

      <u>Section 3.3 Quiet Enjoyment</u>. The Issuer warrants and covenants that it will defend the Company in the quiet enjoyment and peaceable possession of the Project, free from all claims of all Persons claiming by or through the Issuer, except for Permitted Encumbrances, throughout the Term of this Agreement.

**ARTICLE IV**

**COMMENCEMENT AND COMPLETION
OF THE PROJECT; ISSUANCE OF THE BONDS**

      <u>Section 4.1 Agreement to Issue the Bonds</u>. The Issuer has contracted for the sale of the Bonds in order to provide funds, directly or indirectly, for payment of the costs, in whole or in part, of the acquisition, construction, equipping and installation of the Project to promote economic development and job creation and to facilitate a property tax incentive for the Company. The Issuer agrees to issue the Bonds for that purpose.

      <u>Section 4.2 Agreement to Develop the Project</u>. The Company agrees, using advances made on the Bonds pursuant to the Bond Purchase Agreement, to cause the development, acquisition, construction, equipping, and installation of the Project to be completed and that it will complete the acquisition, construction, equipping, and installation of the Project as promptly as practicable after the date of the execution and delivery of this Rental Agreement. The parties hereto acknowledge and agree that title to all components of the Project, including fixtures and personal property, shall vest in the Issuer, and the Project shall be made available for use by the Company hereunder. The Issuer's only obligation to pay Costs of the Project shall be to make available to the Company the proceeds of the Bonds as provided in Section 4.4 hereof. The Issuer shall not be responsible in any other manner to pay Costs of the Project. The Company

9

shall employ, contract with, or otherwise engage suppliers, contractors, and subcontractors in its own name for the Project and shall pursue any remedies against such suppliers, contractors and subcontractors and any sureties of such suppliers, contractors, and subcontractors in its own name, on its own behalf and at its own expense. The Company acknowledges that the Issuer has not participated in or approved the selection of such suppliers, contractors, and subcontractors. It is the intent of the parties hereto that no agency or employment relationship is created hereunder, and the Issuer expressly disclaims all liabilities associated with any contract or subcontract entered into by the Company including, without limitation, any related to the acquisition, installation and equipping of the Project. The Company may make changes to the Project, so long as such changes do not cause the Project to be unsuitable for its intended purpose or fail to constitute a "project" under the Act or to violate any applicable provisions of law. The Company shall indemnify the Authority for all claims, liabilities and losses related to the foregoing pursuant to Section 8.2 of this Agreement.

The Issuer shall become the owner of the improvements as they are acquired and installed on the Land from time to time by operation of law, and the Issuer shall become the owner of the items of the equipment as they are installed on the Land from time to time pursuant to a blanket bill of sale executed and delivered to the Issuer at closing of the sale of the Bonds and supplemental bills of sale for such items of equipment executed and delivered to the Issuer as they are installed at the Project. For such purposes, such Property shall be deemed to be conveyed by the Company to the Issuer, even though the transfer of title is by operation of law, rather than by a legal instrument, and shall be deemed paid for through an advance made with respect to the Bonds. The Company shall adequately identify the equipment installed at the Project in the supplemental bills of sale to the Issuer and in the records of the Company in such manner so as to permit its identification as part of the Project equipment. The Company shall comply with the requirements of the Bond Documents for such acquisition and installation of the improvements and equipment to be financed through the Bonds.

Section 4.3 Liens. Except for Permitted Encumbrances, the Company will not create or permit the creation of, or suffer to exist, any lien, encumbrance, or charge upon the Project, except as consented to in writing by the Issuer, which consent shall not be unreasonably withheld, conditioned, or delayed. Except for Permitted Encumbrances, the Company shall remove, within 30 days from notice of the filing of any mechanic's or materialman's lien on the Project, such mechanic's, or materialman's lien by payment of the debt or the posting of a bond in accordance with O.C.G.A. § 44-14-364.

Section 4.4 Disbursements of Bond Proceeds. The Company is authorized to maintain the Project Fund in the name of the Issuer. Upon the incurrence of Costs of the Project and receipt by the Company of invoices or other proofs of amounts then owing for Costs of the Project, the Company may either: (a) submit such invoices or other documentation of acquisition and a Requisition to the Issuer (notwithstanding the assignment of this Agreement) and the Holder of the Bond, together with instructions to pay the amounts indicated directly to the Persons to whom such Costs of the Project are owing, or (b) pay such Costs of the Project and submit such documentation and a Requisition to the Issuer (notwithstanding the assignment of this Agreement) and the Holder of the Bond together with instructions to reimburse the amounts indicated to the Company. Upon the submission of such a Requisition for Costs of the Project, substantially in the form of Exhibit C attached hereto, signed by a Company Representative, to the Holder of the Bond and the Issuer and the making of the corresponding Advance by the Holder, said Advance shall be paid from the Project Fund to the order of the Company. Notwithstanding the foregoing, the Holder of the Bond, the Issuer, and the Company may enter into an Advance Agreement for making Advances of the principal amount of the Bonds and for payment or reimbursement of Costs of the Project other than as provided herein, as permitted by Section 4.02 of the Bond Resolution. The Bond Purchase Agreement contains such an agreement.

If any State grant money is received which is used by the Company to construct or install buildings or to acquire Equipment to be owned by the Issuer and rented to the Company hereunder, said buildings or Equipment ("Grant-Funded Assets") shall be included as part of the Project and shall be subject to this Agreement. During the term of the related State grant, the Issuer shall retain a security interest in any such

10

Grant-Funded Assets, and the Company hereby authorizes the Issuer to prepare and file a UCC financing statement reflecting such interest. The State documents governing such grant are sometimes referred to herein as "Grant Documents."

Section 4.5 Use of Project. For the entire Term of this Agreement, the Project may be used only for the limited purposes of the acquisition, construction, equipping, installation and improvement of certain production and related facilities, or for other limited purposes permitted by the Act and approved by the Issuer in writing. The Company shall not permit the Project, or any part thereof, to be used in any fashion that would violate in any material respect any applicable law. The Issuer's right to enforce this covenant shall be among the Reserved Rights (as defined in the Bond Resolution). In addition, the Company and its permitted assigns and sublessees, including any Affiliate, will use and operate the Project in all material respects in accordance with all applicable laws, ordinances, rules and regulations, and the Issuer shall have the right to enforce such covenant.

Section 4.6 Establishment of Completion Date; Moneys Remaining. The completion of the Project shall be evidenced to the Issuer by a certificate signed by the Company Representative stating that the acquisition and installation of the Project have been completed to the satisfaction of the Company. Any moneys remaining in the Project Fund on the Completion Date, as soon as practicable after the Completion Date, and no later than 90 days thereafter, at the direction of the Company, shall be applied to partially redeem the Bonds, as provided in the Bond Resolution.

Notwithstanding the foregoing, the Company Representative's certificate may state that it is given without prejudice to any rights against third parties which exist at the date of such certificate, or which may subsequently come into being.

Section 4.7 Issuer Not Liable in Event Bond Proceeds Insufficient. In the event the Bond proceeds should not be sufficient to pay the Costs of the Project in full, the Issuer shall not be liable or responsible for the insufficiency. The Issuer does not make any warranty, either express or implied, that the moneys which will be paid into the Project Fund and which, under the provisions of this Agreement, will be available for payment of the Costs of the Project, will be sufficient to pay all the Costs that will be incurred in that connection.

Section 4.8 Company and Issuer Representatives and Successors. At or prior to the initial sale of the Bonds, the Company and the Issuer shall appoint a Company Representative and an Issuer Representative, respectively, for the purpose of taking all actions and delivering all certificates required to be taken and delivered by the Company Representative and the Issuer Representative under the provisions of this Agreement. The Company and the Issuer, respectively, may also appoint alternate Company Representatives and alternate Issuer Representatives to take any such action or make any such certificate if the same is not taken or made by the Company Representative or the Issuer Representative. In the event any of such Persons, or any successor appointed pursuant to the provisions of this Section, should resign, or become unavailable or unable to take any action or deliver any certificate provided for in this Agreement, another Company Representative or alternate Company Representative, or another Issuer Representative or alternate Issuer Representative, shall thereupon be appointed by the Company or the Issuer, respectively.

Whenever the provisions of this Agreement require the Company's approval or require the Issuer to take some action at the request of the Company, the Company Representative shall make, in writing, such approval or such request unless otherwise specified in this Agreement. The Company shall have no complaint against the Issuer as a result of any action so taken at the written direction of the Company Representative.

Section 4.9 Investment of Moneys in Funds. The Company Representative may direct the investment of any moneys held in funds under the Bond Resolution to the extent permitted by Section 4.03 of the Bond Resolution and by law in Permitted Investments. Any interest accruing on, or profit realized from the investment of any moneys held as part of a fund shall be credited to such fund, and any loss resulting from such investment shall be charged to such fund. The Issuer shall not be liable for any loss

11

resulting from any such investments. For the purposes of this Section, any interest-bearing deposits, including certificates of deposit, shall be deemed to be investments and not deposits.

## ARTICLE V

### RENTAL AND POSSESSION

Section 5.1 Effective Date of this Agreement; Duration of Term. This Agreement shall be effective when delivered on the date of issuance of the Bonds. The initial term hereof ("Initial Term") shall expire at 11:59 p.m. Georgia time on the latter of (a) December 31, 2057, and (b) December 31 of the year that is 27 years from the year in which the first item of the Project would, except for the existence of this Rental Agreement, be subject to *ad valorem* taxation.

(a) Provided that this Agreement is in full force and effect and the Company is not in default under the terms hereof beyond any applicable notice and cure period provided for herein, the Term shall be automatically extended for an additional period expiring at 11:59 p.m. Georgia time on December 1, 2057, unless the Company gives the Issuer and the Holder of the Bond written notice at least 60 days prior to the expiration of the Initial Term of the Company's desire that the Term not be extended.

(b) Provided that this Agreement is in full force and effect and the Company is not in default under the terms hereof beyond any applicable notice and cure period provided for herein, the Term shall be automatically extended for an additional period expiring at 11:59 p.m. Georgia time on December 1, 2057, unless the Company gives the Issuer and the Holder of the Bond written notice at least 60 days prior to the expiration of the Term of the Company's desire that the Term not be extended.

(c) Provided that this Agreement is in full force and effect and the Company is not in default under the terms hereof beyond any applicable notice and cure period provided for herein, the Term shall be automatically extended for an additional period expiring at 11:59 p.m. Georgia time on December 1, 2057, unless the Company gives the Issuer and the Holder of the Bond written notice at least 60 days prior to the expiration of the Term of the Company's desire that the Term not be extended.

(d) "Renewal Term" shall refer to an extended term of this Agreement for the period described in subsections (b) through (d) above. "Term" of this Agreement shall be the Initial Term; if extended for a Renewal Term, "Term" shall then be the Initial Term and each Renewal Term for which this Agreement is, in fact, extended.

(e) Each extension option shall be deemed to be exercised automatically unless the Company, at least 60 days prior to the expiration of the then-current Initial Term or Renewal Term, as applicable, delivers a notice declaring its intention not to renew the Term to the Issuer and the Holder of the Bonds.

(f) Notwithstanding any expiration or termination of this Agreement, those covenants, and obligations that by the provisions hereof are stated to survive the expiration or termination of this Agreement shall survive the expiration or earlier termination of this Agreement.

Section 5.2 Delivery and Acceptance of Possession. The Issuer grants to the Company sole and exclusive possession, occupancy, and use of each component of the Project, subject to the covenants, conditions, restrictions, and terms of this Agreement, as completed, and the Company accepts such rights of possession, occupancy, and use, subject to the covenants, conditions, restrictions, and terms of this Agreement.

Section 5.3 Payment of Rents.

(a) On or before each date provided in the Bond Resolution for the payment of principal or interest on the Bonds, until the principal of, and interest on the Bonds shall have been paid in full, the Company shall pay or cause to be paid to or as directed by the Issuer, as rent for the Project, a sum equal

to the amount payable on such date as principal of and interest on the Bonds, as provided in the Bond Resolution. In any event, each rental payment under this Section shall be sufficient to pay the total amount of principal and interest on the Bonds payable on the payment date. Anything herein to the contrary notwithstanding, any amount at any time held in the Bond Fund shall be credited against the obligation to make rental payments and shall reduce the payment to be then made by the Company. After payment in full of the Bond, annual rental hereunder shall be $1.00. The Company shall have the right to prepay rentals at any time and to cause a corresponding full or partial redemption of the Bonds as described in Section 2.09 of the Bond Resolution. Notwithstanding the foregoing, the Holder of the Bond and the Issuer may provide for a home office payment agreement, or another document with home office payment provisions, for the payment of Basic Rent and debt service on the Bonds in a manner other than the manner set forth herein, in accordance with Section 4.03 of the Bond Resolution.

(b)     Notwithstanding anything herein to the contrary, should the Company not renew the Term of this Agreement for any Renewal Term as permitted by Section 5.1 hereof, the Company shall, on the date the Term will expire, pay or cause to be paid to or as directed by the Issuer, as Additional Rent in arrears, the sum equal to any remaining outstanding principal balance of the Bonds plus any accrued and unpaid interest on the Bonds in accordance with Section 4(b) of the Bond Purchase Agreement. Upon payment of such amounts, this Agreement will terminate.

(c)     Except for costs and expenses for which the Issuer or the State is expressly responsible for under the Project Agreement, the Company agrees that it shall pay directly to the Issuer, as Additional Rent, an amount sufficient to reimburse the Issuer for all reasonable expenses and advances reasonably incurred by the Issuer hereunder in connection with the Project subsequent to the execution of this Agreement, including, but not limited to, the reasonable fees and expenses of counsel for the Issuer, provided that the same are incurred as a result of the failure of the Company to comply with the terms of this Agreement, subject to the notice obligations and cure periods set forth in Article X of this Agreement, or are subject to payment or indemnification by the Company hereunder. All payments of Additional Rent described in this paragraph shall be billed to the Company by the Issuer from time to time, together with a statement certifying that the amount for which reimbursement is sought for one or more of the above-described expenditures has been incurred or paid by the Issuer. Amounts so billed shall be paid by the Company within 30 days after receipt of the bill, which shall contain reasonable detail, by the Company; the right of the Issuer to payments under this Section 5.3 is one of the Reserved Rights. In the event the Company shall fail to make any of the payments required in this Section 5.3, the unpaid amount shall continue as an obligation of the Company until fully paid and shall accrue interest from such thirtieth day at the rate of 6.00% per annum.

(d)     the Company agrees that it will pay to the Issuer as Supplemental Rent, the Local Recoupment Amount (as such terms are defined in the Project Agreement) owed by the Company to the Issuer pursuant to the terms of the Project Agreement. Such payments of Supplemental Rent shall be paid at the times required by the Project Agreement, shall be paid without duplication of the Company's obligations under the Project Agreement, and shall be paid to the Issuer or to the State, in whole or in part, as set forth in the Project Agreement or as directed in writing by the Issuer.

Section 5.4 Place of Payments. Except as otherwise provided by Section 4.01 of the Bond Resolution, the rents provided for under Section 5.3 hereof shall be paid directly to the Paying Agent at the office designated by the Paying Agent for the account of the Issuer for so long as the Bond remains outstanding.

Section 5.5 Obligations of Company Unconditional. The obligations of the Company to make the payments required under Section 5.3 hereof and to perform and observe the other agreements on its part contained herein shall be absolute and unconditional and shall not be subject to diminution by set-off, counterclaim, abatement or otherwise, and during the Term the Company (a) will not suspend or discontinue, or permit the suspension or discontinuance of, any payments provided for in Section 5.3 hereof, (b) will perform and observe all of its other agreements contained in the Bond Documents to which it is a

13

party and, (c) except as expressly permitted by the terms of the Bond Documents, will not terminate this Agreement for any cause including, without limiting the generality of the foregoing, failure to acquire or complete the Project, any acts or circumstances that may constitute failure of consideration, sale, loss, diminution, destruction or condemnation of or damage to the Project, commercial frustration of purpose, any change in the tax or other laws or administrative rulings of or administrative actions by the United States of America or the State or any political subdivision of either, or any failure of the Issuer to perform and observe any agreement, whether expressed or implied, or any duty, liability or obligation arising out of or connected with this Agreement. Nothing contained in this Section shall be construed to release the Issuer from performance of any of the agreements on its part herein contained, and in the event the Issuer shall fail to perform any such agreement on its part, the Company may institute such action against the Issuer as the Company may deem necessary to compel performance, provided that no such action shall (i) violate the agreements on the part of the Company contained in the first sentence of this Section or (ii) diminish the amounts required to be paid by the Company pursuant to Section 5.3 hereof; provided, however, the Issuer shall have no liability to pay any pecuniary amounts other than from the Security. The Company may, however, at its own cost and expense and in its own name or in the name of the Issuer, prosecute or defend any action or proceeding or take any other action involving third Persons that the Company deems reasonably necessary to secure or protect its right of possession, occupancy and use hereunder, and in such event the Issuer hereby agrees to cooperate fully with the Company and to take all lawful action which is required to effect the substitution of the Company for the Issuer in any such action or proceeding if the Company shall so request.

## ARTICLE VI

### IMPROVEMENTS AND MODIFICATIONS; TAXES AND INSURANCE

Section 6.1 Improvements and Modifications of Project by Company. The Company may from time to time, at its own expense, make additions, modifications, or improvements to the Project, including without limiting the generality of the foregoing the installation of machinery, equipment, and related property, desirable for its business purposes, provided that any such additions, modifications or improvements do not unduly interfere with the use of the Project. All machinery, equipment and related property so installed by the Company and paid for with other than proceeds of the Bonds, unless substituted as provided in Section 6.2 below or otherwise agreed in writing, shall remain the sole property of the Company and may be modified or removed at any time while the Company is not in default under this Agreement. Title to all additions, modifications or improvements that constitute a part of the Project paid for with amounts from the proceeds of the Bonds shall be in the Issuer and shall be subject to this Agreement. The Company will retain title to additions, modifications or improvements not constituting part of the Project and paid for with other than amounts from the proceeds of the Bonds, unless otherwise agreed in writing, whether or not they are attached to some portion of the Project, and the Issuer agrees to provide to the Company appropriate easements and use of shared facilities to the extent required by the Company. The Company will provide notice to the Issuer of any additional modifications or improvements to the Project and of demolition and replacement of buildings if estimated at the time of construction to have an aggregate cost in excess of $5,000,000. Such notice may be made via email to the Issuer's Chairperson and attorney. The Company will file a copy of the plans and specifications for any such additions, modifications or improvements to the Project or the Land with the Issuer. The Company shall not do, or permit any other Person under its control to do, any work in or about the Project or related to any repair, rebuilding, restoration, replacement, alteration of, or addition to the Project, or any part thereof, unless the Company or such other Person shall have first procured and paid for all requisite and applicable municipal and other governmental permits and authorizations. All such work shall be done in a good and workmanlike manner and in compliance with all applicable laws, ordinances, governmental regulations, and requirements.

Section 6.2 Removal of Equipment. The Issuer shall not be under any obligation to renew, repair or replace any inadequate, obsolete, worn-out, unsuitable, undesirable, or unnecessary Equipment. In any instance where the Company determines that any items of Equipment are not necessary at the facility or

14

facilities that are the subject of this Agreement, the Company may remove such items of Equipment and transfer, sell, trade-in, exchange or otherwise dispose of them (as a whole or in part), and thereupon such removed Equipment shall no longer be subject to this Agreement and shall not be considered part of the Project. If requested by the Company, the Issuer shall deliver a quitclaim bill of sale for such removed Equipment to the Company. The removal from the Project of any portion of the Equipment pursuant to the provisions of this Section shall not entitle the Company to any abatement or diminution of the amounts payable under Section 5.3 hereof. Notwithstanding the foregoing, the Company shall not remove, sell, replace, dispose, or otherwise transfer any Grant-Funded Assets prior to the closeout of the related State grant without the prior written consent of the Issuer.

The Company from time to time shall cause to be redeemed an amount of the Bonds corresponding to the book value of Equipment removed and not replaced (rounded to the nearest $5,000) pursuant to the provisions of this Section 6.2, but the Company shall not be required to do so for so long as the aggregate book value with respect to which corresponding redemptions have not been made does not exceed $5,000,000.

The Company will promptly report from time to time such removal, substitution, sale, and other disposition; provided that no such report need be made until the amount on account of all such sales, trade-ins, or other dispositions not previously reported aggregates at least $5,000,000. Such report may be made via email to the Issuer's Chairperson and attorney. The Company will not remove or permit the removal of any item of Equipment except in accordance with the provisions of this Section.

Section 6.3 Taxes, Other Governmental Charges and Utility Charges. The Company shall pay or cause to be paid as the same become due and payable, (a) any taxes and governmental charges of any kind whatsoever lawfully assessed and properly due upon or with respect to the Project or the interest of the Company under this Agreement, (b) all lawfully assessed taxes and governmental charges of any kind whatsoever upon or with respect to the Project or any improvements thereon or machinery, equipment or other personal property installed or brought by the Company or any Affiliate of the Company therein or thereon, (c) all utility and other charges incurred in the operation, maintenance, use, occupancy and upkeep of the Project and (d) all assessments and charges lawfully assessed and properly made by any governmental body for public improvements that may be secured by a lien or charge on the Project; provided that with respect to special assessments or other governmental charges that may lawfully be paid in installments over a period of years, the Company shall be obligated to pay only such installments as they become due and payable; provided further that the Company may contest any of the items in (a) through (d) in good faith through appropriate proceedings. The provisions set forth above shall, as to *ad valorem* taxes, not be deemed to be an admission by the Issuer or the Company that any *ad valorem* taxes assessed against the Project are properly payable with respect to the Project, it being the understanding of the parties that, under the Act, the Issuer's interest in the Project is exempt from *ad valorem* taxes and that the interest in the Project created hereby in the Company, under current State law, is a mere usufruct and/or bailment for hire, which is not a taxable interest for purposes of *ad valorem* taxation. By entering into this Agreement, the Company agrees to make certain payments in lieu of property taxes according to Exhibit D.

If the Company shall first notify the Issuer of its intention so to do, the Company may, at its own expense and in its own name and behalf and in good faith, contest any such taxes, assessments, and other charges and, in the event of any such contest, may permit the taxes, assessments, or other charges so contested to remain unpaid during the period of such contest and any appeal therefrom but not to exceed a period of two years from the original due date.

Section 6.4 Special Covenants Related to *Ad valorem* Taxation. It is the understanding of the parties that the Issuer does not pay ad valorem property taxes on its interest in the Project. The Company's interest in the Project under this Agreement constitutes a mere usufruct and bailment for hire (which are not separately taxable estates) and does not constitute an estate for years (which would be an estate in which the leasehold interest would be taxable based on the value of the leasehold interest). Thus, while this Agreement is in effect, the parties hereto contemplate that the Company shall be liable for no actual ad

valorem property taxes on its interest in the Project. In the event that (i) any tangible property interest of the Company in the Project becomes subject to ad valorem property taxation during the period of time that title to the Project is vested in the Issuer or (ii) this Agreement is determined to grant to the Company a "special franchise" or an "unenumerated franchise" within the meaning of Article 9 of Chapter 5 of Title 48 of the Official Code of Georgia Annotated or any successor statutes, the amounts to be paid hereunder as Basic Rent (but not as Additional Rent) shall be reduced (but not below zero) by the actual payments paid by the Company as ad valorem property taxes on the Company's tangible property interest in the Project or on any special franchise or unenumerated franchise determined to be granted by this Agreement, other than special assessments. The Company shall furnish to the Issuer and to the Bondholder, upon request, validated receipts showing the payment of any such ad valorem property taxes on the Company's tangible property interest in the Project or on any special franchise or unenumerated franchise determined to be granted by this Agreement.

Section 6.5 PILOT Payments. Unless adjusted pursuant to the terms of Article II of the Project Agreement, Company shall make the payments in lieu of taxes on the Project in accordance with Exhibit D attached hereto and incorporated herein ("PILOT Payments").

Section 6.6 Insurance Required. The Company will, during the term of this Agreement and at all times while any Bond is outstanding, continuously maintain or cause to be maintained such policies of insurance for casualty and extended loss for the full insurable value of the Project (less deductibles satisfactory to the Issuer) and in any event as may be required by applicable laws, statutes, regulations, rules, or orders. The Issuer shall be named as insured (or additional insured, as appropriate) on all such policies. In addition, the Company shall comply or cause compliance with applicable workers' compensation laws of the State. The Company shall carry public liability insurance in minimum amounts of $1,000,000 per occurrence, and $3,000,000 in the aggregate, and with umbrella coverage of not less than $10,000,000 and in all events satisfactory to the Issuer, and the Issuer shall be named as an "additional insured" on each such policy by endorsement. The Issuer must be furnished with appropriate certificates of insurance indicating all required endorsements. The Company will not terminate the insurance without 30 days' prior notice to the Issuer upon the closing date and upon demand (or, without demand, not less frequently than annually thereafter). If the Company shall fail to carry any such insurance, the Issuer shall be authorized, but shall not be required, after notice to the Company, to advance such funds to correct the deficiency, which advance the Company shall be obligated to repay on demand with interest to accrue at the rate of 18% per annum.

The Issuer and the Holder shall each, respectively, be entitled to enforce the provisions of this Section insofar as their rights are concerned and the Issuer's right to enforce this Section shall be one of the Reserved Rights.

Section 6.7 Conduct of Business. The Company warrants that throughout the Term it shall, at its own expense, maintain the Project in all material respects in compliance with all applicable life and safety codes and all legally enforceable health, environmental, and safety ordinances and laws, including all applicable Environmental Laws, and all other applicable laws, ordinances, rules, and regulations of the United States of America, the State, and any political subdivision or agency thereof having jurisdiction over the Project and which relate to the operations of the Project, any violation of which would have a material adverse effect on the Company's ability to fully perform its obligations under this Agreement. The Company's use of the Project shall, in all material respects, conform to all laws and regulations of any governmental authority possessing jurisdiction thereof, and the Company shall, in its use or operation of the Project, not discriminate or permit discrimination on the basis of race, sex, age, disability, religion, color or national origin in any manner prohibited by local state or federal laws, rules, orders or regulations. The Company shall do all things necessary to obtain, maintain, modify, supplement and renew, from time to time, as necessary, all public filings, permits, licenses, franchises, and other governmental approvals necessary for its activities relating to the Project, the lack of which would have a material adverse effect upon the Company's ability to meet its obligations under this Agreement. The Company further agrees that it shall not: (a) use the Project for any illegal purpose, nor for any purpose inimical to the health, safety and

16

welfare of the public, (b) fail to reasonably maintain the Project Site (reasonable wear and tear excepted), or (c) violate any condition or provision of any permit issued by the U.S. Army Corps of Engineers pursuant to Section 404 of the Clean Water Act (33 U.S.C. 1344) or Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 401).

The Company may, at its own expense and in its own name and on behalf of or in the name of the Issuer and in good faith, contest any allegation that it has not complied with the laws described in this Section 6.7 and, in the event of any such contest, the provisions of this Section 6.7 shall not apply to any such alleged violations of law during the period of such contest and any appeal therefrom. The Issuer shall, at the expense of the Company, cooperate fully with the Company in any such contest.

The Issuer and the Holder shall each be entitled to enforce the provisions of this Section, and the Issuer's right to enforce this Section shall be one of the Reserved Rights.

Section 6.8 Right of Inspection. The Issuer, the Holder and their respective duly authorized representatives and agents, shall have the right, upon at least forty-eight (48) hours prior notice to the Company, to enter the Project at all reasonable times during the Term, if accompanied by a Company representative, for the purpose of (i) examining and inspecting the Project and (ii) performing such work relating to the Project as has been made necessary by reason of an Event of Default, (iii) confirming compliance by the Company with its obligations under the Bond Documents, including verification of employment and investment data, and (iv) any other purpose reasonably related to the compliance of the Company with its obligations hereunder or under the Bond Documents. Any such representatives and agents shall comply with the Company's safety and other facility access policies and procedures. In the case of the Issuer, the authorized representatives and agents permitted to conduct inspections under this Section shall consist of the Chairman or other currently appointed officer of the Issuer, legal counsel to the Issuer, and any other Person or individual reasonably approved by the Company; provided that each such representative and agent and other Person shall sign a confidentiality agreement in favor of the Company at the request of the Company in form and substance reasonably satisfactory to the Company.

Section 6.9 Repair and Maintenance. The Company agrees, at its own expense, to keep the Project in a safe condition and to repair and maintain the Project in accordance with standard practice in its industry, normal wear and tear excepted. The Issuer shall not be under any obligation to renew, repair or maintain any portion of the Project or to remove and replace any inadequate, obsolete, worn out, unsuitable, undesirable, or unnecessary portion thereof.

Section 6.10 Depreciation, Cost Recovery, and Investment Credit. The Issuer covenants and agrees that any depreciation, cost recovery or investment tax credit with respect to the Project or any part thereof shall belong to the Company and not to the Issuer, and the Issuer will fully cooperate with the Company in any effort by the Company to avail itself of any such depreciation, cost recovery or investment tax credit, but the Issuer shall not have any responsibility or liability for the Company's failure to receive any such depreciation, cost recovery or investment tax credit.

## ARTICLE VII

### DAMAGE AND DESTRUCTION; CONDEMNATION

Section 7.1 Damage and Destruction. If the Project is destroyed or is damaged by fire or other casualty, in whole or in excess of 50% of the full replacement cost thereof, the Company shall notify the Issuer in writing as to the nature and extent of such damage or loss and whether it is practicable and desirable to repair or restore such damage or loss.

If the Company elects, the Company shall apply so much of its own funds as may be necessary, and so much as may be necessary of the Net Proceeds of insurance, to the payment of the costs of such repairing and restoring. The repaired or restored assets shall constitute part of the Project owned by the Issuer and subject to this Agreement. Any balance of such Net Proceeds remaining after payment of all the

17

costs of such repairing and restoring shall be and remain the Company's own funds.

The Company may elect to cause all of the Net Proceeds of insurance received by reason of any damage or destruction of the Project (or as much thereof as may be required to redeem the Bond in whole) to be deposited into the Bond Fund and applied to the redemption of the Bonds, and if the Bonds is redeemed in whole, any excess Net Proceeds shall be retained by the Company.

The Company shall not, by reason of its inability to use all or any part of the Project during any period in which the Project is damaged or destroyed, or is being repaired, rebuilt or restored, nor by reason of the payment of the costs of such repairing or restoring, be entitled to any reimbursement from the Issuer, or the Holder or owner of the Bond or any abatement or diminution of the amounts payable under Section 5.3 hereof.

Section 7.2. Condemnation. In the event that title to, or the temporary use of, all or any significant part of the Project shall be taken under the exercise of the power of eminent domain by any Governmental Authority, or Person, firm or corporation acting under Governmental Authority, the Company shall be obligated to continue to make all of the payments specified in Section 5.3 hereof. Unless substitute improvements are to be acquired in accordance with the terms hereof, any Net Proceeds received from any award or awards in respect of the Project or any part thereof made in such condemnation or eminent domain proceedings (or as much thereof as may be required to redeem the Bonds in whole) shall be paid to the Issuer, but only to the extent the property taken by condemnation or eminent domain is a portion of the Land which has not been materially improved by the Company, and remaining Net Proceeds shall be applied to the redemption of the Bonds, or if the Bonds are redeemed in whole, any excess Net Proceeds shall be retained by the Company. In the event that title to any additional property for the Project is acquired by the State through purchase, condemnation or eminent domain, title to such property will remain in the State and will be leased to the Issuer and rented to the Company under this Agreement.

Following the entry of a final order in any eminent domain proceedings granting condemnation of the Protect, the Company shall notify the Issuer in writing as to the nature and extent of such condemnation and whether it is practicable and desirable to acquire or construct substitute improvements. If the Company shall determine that such substitution is practicable and desirable, then with the approval of the Issuer, which shall not be unreasonably withheld, delayed or conditioned, the Company may proceed with and complete the acquisition or construction of such substitute improvements and the Company may apply its funds, including so much as may be necessary of the Net Proceeds received by the Company pursuant to this Section, to the payment of the costs of the acquisition or construction of such substitute improvements. If such Net Proceeds are not sufficient to pay in full the costs of such acquisition and construction, the Company shall pay the portion of the costs thereof in excess of the amount of such Net Proceeds. The substitute improvements shall constitute part of the Project owned by the Issuer and subject to this Agreement. Any balance remaining after payment of all of the costs of such acquisition and construction shall be the Company's own funds.

The Company shall not, by reason of its inability to use all or any part of the Project during any such period of restoration or acquisition, or by reason of the payment of such costs, be entitled to any reimbursement from the Issuer, or the Holder or owner of the Bonds or any abatement or diminution of the amounts payable under Section 5.3 hereof.

## ARTICLE VIII

### SPECIAL COVENANTS

Section 8.1. Company to Maintain its Existence; Conditions Under Which Exceptions Permitted.

(a)     Subject to the provisions of paragraph (b) below, the Company will do or cause to be done all things necessary to preserve and keep in full force and effect its existence as a legal entity.

(b)     The Company covenants that, unless the consent is obtained of the Issuer and the Holder of the Bond, it will not merge or consolidate with any other entity, unless (i) either the Company shall be the continuing entity, or the successor or surviving entity which acquires all or substantially all the assets of the Company shall assume in writing all obligations of the Company hereunder, and (ii) no Event of Default or event that with the giving of notice, the lapse of time, or both, would constitute an Event of Default shall have occurred and be continuing immediately before or immediately after such merger, consolidation, sale, lease or conveyance. The parties hereto agree that the Company shall not be required to obtain the consent of the Issuer and the Holder of the Bond prior to a direct or indirect change of control of the Company.

Section 8.2 Release and Indemnification of the Issuer.

(a)     The Company shall, and agrees to, indemnify and save the Issuer and its officials, directors, officers, members, counsel, agents and employees (collectively "Indemnified Persons") harmless against and from all claims by or on behalf of any Person arising from the conduct or management of or from any work or thing done at the Project and against and from all claims arising from or relating to (i) any condition of the installation of or the operation of the Project, (ii) any act or gross negligence of the Company or of any of its agents, contractors, servants, employees or licensees, (iii) any act or negligence of any assignee or subtenant of the Company or of any agents, contractors, servants, employees or licensees of any assignee or subtenant of the Company, (iv) any violation or alleged violation of any federal or state securities laws or (v) any legal proceeding relating to the non-taxability or taxability of this Agreement or the Project or the interest of the Issuer in the Project. However, with respect to matters referred to in the preceding clauses (i), (ii), (iii) or (iv), this indemnity shall not apply, as to any Indemnified Person, to any acts of gross negligence or willful misconduct or intentional misconduct of any Indemnified Person. The Company shall indemnify and save the Issuer (and the other Persons and entities referred to above, as appropriate) harmless from and against all costs and expenses incurred in or in connection with any such claim or in connection with any action or proceeding brought thereon, including attorneys' fees; and, upon notice from the Issuer, the Company shall defend it (and the other Persons and entities referred to above, as appropriate) in any such action or proceeding. The indemnities set forth above specifically extend to, but are in no way limited to, governmental or other claims relating to any actual or alleged violation of any environmental laws, regardless of whether or not any such violation relates to any period prior to the acquisition of the Project by the Issuer or its acquisition theretofore by the Company.

(b)     Notwithstanding the fact that it is the intention of the parties that the Indemnified Persons referred to in (a), above, shall not incur pecuniary liability by reason of the terms of this Agreement or the other documents relating to the Bonds, or the undertakings required of the Issuer hereunder or by reason of (i) the issuance of the Bonds, (ii) the execution of this Agreement or the adoption of the Bond Resolution, (iii) the performance of any act required by this Agreement or other documents relating to the Bonds, (iv) the performance of any act requested by the Company, or (v) any other costs, fees or expenses incurred by the Issuer with respect to the Project or the financing thereof, including all claims, liabilities or losses arising in connection with the violation of any statutes or regulations pertaining to the foregoing; nevertheless, if any such Indemnified Person should incur any such pecuniary liability, then in such event the Company shall indemnify and hold harmless such Indemnified Person against all claims by or on behalf of any Person arising out of the same and all costs and expenses incurred in connection with any such claim or in connection with any action or proceeding brought thereon, including attorneys' fees, and, upon notice from the Issuer, the Company shall defend the Issuer in any such action or proceeding; provided that if a court of competent jurisdiction determines that any of the provisions of this Section violate O.C.G.A. § 13-8-2 and are applicable to this Agreement, the indemnity contained in this Section shall not extend to any indemnification which is prohibited by O.C.G.A. § 13-8-2.

(c)     The Indemnified Party shall give written notice of any claim of which it has actual notice and for which the Company shall be held responsible under this Section, and shall afford the Company any opportunity the Indemnified Person has to contest the same; provided that any settlement prepared by the Company must be approved by the Indemnified Person which consent shall not unreasonably be withheld, conditioned, or delayed. The indemnities set forth above shall not apply, as to any Indemnified Person, for any claim or liability for which the Company was not given any opportunity to contest or for any settlement of any such action effected without the Company's written consent.

(d)     The indemnity of the Indemnified Persons contained in this Section shall survive the termination of this Agreement for a period of five (5) years.

(e)     The Issuer shall be entitled to enforce its right to indemnification under this Section, and the Issuer's right to indemnification hereunder shall be one of the Reserved Rights not transferred to the bondholder.

(f)     If the Company is required to make a payment to the State or the Issuer under this Section 8.2, then at the written request of the State or the Issuer, as applicable, such payment shall be made to a payee requested by the State or the Issuer, as applicable, including, without limitation, the State Tort Claims Trust Fund, the State Authority Liability Trust Fund, the State Employee Broad Form Liability Fund, the State Insurance and Hazard Reserve Fund, and other self-insured funds established and maintained by the State Department of Administrative Services Risk Management Division, instead of paying the State or the Issuer directly.

Section 8.3 Company's Performance Under the Bond Resolution. The Company agrees, for the benefit of the Holder from time to time of the Bond, to do and perform all acts and things contemplated in the Bond Resolution to be done or performed by it.

Section 8.4 Further Assurances and Corrective Instruments. The Issuer and the Company agree that they will, from time to time, execute, acknowledge, and deliver, or cause to be executed, acknowledged, and delivered, such supplements hereto and such further instruments as may reasonably be required for correcting any inadequate or incorrect description of the Project and for carrying out the intention of or facilitating the performance of this Agreement.

Section 8.5 Indemnity Against Expenses. The Company agrees to pay any reasonable expenses of the Issuer not specifically mentioned herein, and to indemnify the Issuer against the same, which are actually and directly incurred by the Issuer in connection with the Bond Documents or in the administration or modification or enforcement thereof, including without limitation the reasonable fees and expenses of legal counsel.

## ARTICLE IX

### ASSIGNMENT, SUBLETTING, PLEDGING, AND SELLING; REDEMPTION

Section 9.1 Assignment of Agreement by the Company. Except as provided in this Section, the Company may not assign or convey any or all of its rights, interests, duties and/or obligations in this Agreement without the prior written consent of the Issuer, except (i) to an Affiliate, or (ii) in a merger, consolidation, sale or conveyance of substantially all of the Company's assets pursuant to which the Issuer's consent is not required under Section 8.1(b) hereof.

(a)     Any assignment authorized by this Section 9.1 shall be subject to each of the following conditions:

(i)     Any such assignee shall agree to fully and unconditionally assume all obligations of the Company under this Agreement, including, without limitation, all indemnity provisions

contained in this Agreement, whereupon the assignor shall be released from all obligations arising under this Agreement accruing after the assignment; provided, however, any Lender acquiring the Company's interest in this Agreement shall not be required to assume obligations and liabilities related to pre-closing breaches of this Agreement by the Company; and

(ii)     The Company shall, upon or prior to the execution of any assignment or any merger, consolidation, or sale of substantially all of its assets, furnish or cause to be furnished to the Issuer a true and complete copy of such proposed assignment or documents of merger, consolidation, or sale of assets, as the case may be. The Company or such assignee shall, within 30 days after the execution thereof, furnish or cause to be furnished to the Issuer a true and complete copy of such assignment or documents of merger or consolidation or sale of assets, as the case may be, as actually executed. The Issuer and the Holder of the Bond shall have the right, at any time and from time to time, to notify any assignee of their rights under this paragraph.

(b)     Notwithstanding anything else herein contained, this Agreement shall not restrict or require the consent of any Person to any (i) transfer, pledge or other disposition of the stock, membership interest, partnership interest or other equity interest in the Company, (ii) transfer, pledge or other disposition of the assets or property held by, or the stock, membership interest, partnership interest or other equity interest in, any Affiliate of the Company or (iii) merger, consolidation or reorganization of any Affiliate of the Company.

(c)     Any purported assignment in violation of this Section 9.1 shall be void. In the case of an assignment that is permitted hereby or that is consented to as herein described, the assignee may not further assign this Agreement except in accordance with this Section 9.1.

(d)     Notwithstanding any event permitted by this Section 9.1, the Project must continue for the Term of this Agreement to be operated as part of a "project" within the meaning of the Act.

(e)     The Bond may be assigned to any permitted assignee of this Agreement.

(f)     Notwithstanding the foregoing, the Company may assign its interest in the Project, this Agreement and the other Bond Documents pursuant to an Exempt Assignment without the consent of the Issuer; provided that, any assignee of the Company shall agree to fully and unconditionally assume all obligations of the Company arising under this Agreement and the other Bond Documents, including, without limitation, all indemnity provisions contained in this Agreement. Such assumption by Company's assignee may be limited to matters first arising from and after the date of the assignment, provided that the Company and assignee have received prior written confirmation from the Issuer that the Issuer is satisfied that the Company will continue to be responsible for matters first arising prior thereto, and that the Company will have the financial capability thereafter to satisfy, and will continue to satisfy, its continuing indemnification obligations.

(g)     The Company may finance and refinance with a Lender any debt secured by the Project freely and may pledge its interest hereunder to a Lender in an Exempt Assignment, subject to the requirements of the Bond Resolution and of this Agreement, including the requirement that the ownership of the Bond and the interest of the Company in this Agreement not be separated. The Issuer at the written request of the Company and with the written consent of the Bondholder, shall execute and deliver to a Lender, or shall join the Company in the execution and delivery to a Lender, of a Superior Security Document or subordination agreement in favor of such Lender with respect to the Project (provided that such document or instrument is nonrecourse to the Issuer except that recourse may be had against the Issuer's interest in the Project other than its Reserved Rights) which encumbers or subordinates the Issuer's fee interest and/or consents to a pledge by the Company of its interest, and may execute any related documents in connection with the Company's financing or refinancing of the Project. Without limitation, as authorized in the Bond Resolution, any Superior Security Document, subordination agreement and/or any other document or instrument that is requested or required by any Lender, requested of the Issuer by

the Company, consented to by the Bondholder, and approved by the Chairman of the Issuer (provided that the same is nonrecourse to the Issuer except that recourse may be had to its interest in the Project other than its Reserved Rights) may be executed and delivered by the appropriate officers of the Issuer, and may include such changes, corrections, completions, deletions, insertions, variations, additions, or omissions to the related Issuer Contracts that are consistent with the intent and purpose of the Bond Resolution and are approved by the Chairman of the Issuer; such consistency and approval shall be conclusively evidenced by the Chairman's execution of each such document or instrument. Any such Superior Security Document, subordination agreement or other document or instrument shall be prepared at the expense of the Company and reviewed by Issuer's counsel at the expense of the Company and shall be subject to the approval by the Chairman of the Issuer, which approval shall not unreasonably be withheld, conditioned, or delayed. The foregoing and any other provision hereof or of any Loan Documents to the contrary notwithstanding, the Issuer's only liability under any such Superior Security Document, subordination agreement, or other document or instrument shall be limited to recourse to the Issuer's interest in the Project, and in no event shall Issuer's Reserved Rights or its rights under the Project Agreement incorporated therein be assigned, pledged or subordinated.

Section 9.2 Subletting. The Project may not be sublet or subjected to a similar arrangement, as a whole or in part, except to an Affiliate, without the prior written consent of the Issuer, which consent will not be unreasonably withheld. In the case of proposed subleases to suppliers of the Company, the consent of the Issuer will not be unreasonably withheld. Notwithstanding any such arrangement to which the Issuer consents, the Project must continue for the Term of this Agreement to be operated as certain production and related facilities, and as a "project" within the meaning of the Act. Proceeds of the Bonds may not be used to pay costs of acquiring, constructing or equipping property of any permitted sublessee, or to pay costs of acquiring, constructing or equipping property of the Company for the purpose of subleasing to a permitted sublessee.

Section 9.3 Assignments of this Agreement or Sale of Project by the Issuer; Consolidation or Merger of Issuer. It is understood and agreed that certain payments required under Section 5.3 hereof by the Company are pledged and assigned by the Issuer pursuant to the Bond Resolution as security for payment of the principal of and interest on the Bond. The Company assents to such assignment and hereby agrees that its obligation to make such payments shall be absolute and shall not be subject to any defense or any right of set-off, counterclaim or recoupment arising out of any breach by the Issuer of any obligation to the Company, whether hereunder or otherwise, or out of any indebtedness or liability at any time owing to the Company by the Issuer.

Except for the assignment of this Agreement and the rents, revenues, and receipts hereunder pursuant to the Bond Resolution, and subject to any Exempt Assignments and/or any sale, conveyance, or other alienation as may be permitted by the Security Deed or any Superior Security Document, the Issuer agrees that it will not attempt to further assign, transfer, or convey its interest in this Agreement or create any pledge or lien of any form or nature with respect to the payments under this Agreement. The Issuer agrees further that, except as expressly provided in Section 9.3 or elsewhere in this Agreement or the Bond Resolution or except with the consent of the Company, it shall not (a) sell, assign, pledge, mortgage, encumber, transfer or convey the Project during the Term, or (b) create or suffer to be created any debt, lien or charge on the rents, revenues or receipts arising out of or in connection with its ownership thereof. Nothing contained in this Section shall prevent the consolidation of the Issuer into any public body whose property and income are not subject to taxation and which has authority to exercise the powers granted herein and in the Act; provided, that upon any such consolidation, merger or transfer, the due and punctual payment of the principal of and interest on the Bond according to its tenor, and the due and punctual performance and observance of all the agreements and conditions of this Agreement to be kept and performed by the Issuer, shall be expressly assumed in writing by the public body resulting from such consolidation or surviving such merger.

Section 9.4 Redemption of Bond at Request of Company. If the Company has the right under this Agreement to cause the redemption of the Bonds, the Issuer, at the request and sole expense of the

Company, shall forthwith take all steps that may be necessary under the applicable redemption provisions of the Bond Resolution to effect such redemption on the date set for the redemption by the Company, provided that all funds necessary for redemption shall be provided by the Company. So long as the Issuer is not obligated to call the Bonds pursuant to the terms of the Bond Resolution, the Issuer shall not otherwise redeem any Bond prior to its maturity.

Section 9.5 Acknowledgement of Subordination. Except for the Reserved Rights of the Issuer, this Agreement is subject and subordinate to any Superior Security Document, to all other Liens granted by the Company to the holder of such Superior Security Document with respect to or in connection with the indebtedness secured by such Superior Security Document, and to all modifications, extensions, refinancings (where such Liens continue), or renewals of such Lien.

## ARTICLE X

### EVENTS OF DEFAULT AND REMEDIES

Section 10.1 Events of Default Defined. The following shall be "Events of Default" under this Agreement, and the term "Event of Default" shall mean, whenever it is used in this Agreement, any one or more of the following events:

(a)    Failure by the Company to make all payments of Basic Rent, Additional Rent and Supplemental Rent as required pursuant to Section 5.3 herein and the continued failure to make such payments for a period of 30 days after receipt of written notice from Issuer specifying such failure and requesting that it be remedied; provided however that if the Company is then Holder of the Bonds, Basic Rent shall be deemed to have also been paid, as provided by Sections 5.3 and 5.4 hereof; or

(b)    Failure by the Company to make PILOT Payments as the same become due and payable and the continued failure to make such payments for a period of 5 Business Days after receipt of written notice from the Issuer;

(c)    The occurrence of an Event of Default under the Bond Resolution; or

(d)    Failure by the Company to observe and perform any covenant, condition or agreement on its part to be observed or performed in this Agreement, other than as referred to in (a) above, for a period of 30 days after written notice, specifying such failure and requesting that it be remedied, is given to the Company by the Issuer, unless the Issuer shall agree in writing to an extension of such time prior to its expiration; provided, however, if the failure stated in the notice is such that it cannot reasonably be corrected within the applicable period, it shall not constitute an Event of Default if corrective action is instituted within the applicable period and diligently pursued until the default is corrected.

The Issuer shall promptly notify the Company and the Holder in writing of any Event of Default hereunder of which the Issuer has actual knowledge.

Section 10.2 Remedies on Default. Whenever any Event of Default under Section 10.1 hereof shall have happened and is continuing, subject to and as may be limited by the requirements of any Superior Security Documents, the following remedies shall be available:

(a)    The Issuer may, at its option, declare all payments of Basic Rent under Section 5.3 hereof for the remainder of the stated Term of this Agreement to be immediately due and payable, whereupon the same shall become immediately due and payable. If the Issuer elects to exercise the remedy afforded in this Section 10.2(a)(i) and accelerates all Basic Rent payable under Section 5.3 hereof for the remainder of the Term of this Agreement, the amount then due and payable by the Company as accelerated rents shall be the sum of (1) the aggregate outstanding principal amount of the Bonds (if the Company is then the owner of the Bonds, the Company may mark the Bonds "cancelled" and surrender the Bonds to the Issuer and the

Bonds will be deemed paid in full), and (2) all interest on the Bonds then due and to become due until payment of the Bonds in full. Such sums as may then become payable shall be paid into the Bond Fund and after the principal of the Bonds and accrued interest thereon have been Billy paid and any costs occasioned by such default have been satisfied, any excess moneys in the Bond Fund shall be returned to the Company as an overpayment of Basic Rent;

(b)     the Issuer may terminate this Agreement and the rights of possession, occupancy and use of the Project created hereunder and exclude the Company from use of the Project; and

(c)     the Issuer may take whatever action at law or in equity may appear necessary or desirable to collect the rents then due and thereafter to become due, or to enforce performance and observance of any obligation, agreement, or covenant of the Company under this Agreement.

(d)     Any amounts collected pursuant to action taken under this Section (except for payments of PILOT Payments, Additional Rent, Supplemental Rent or any other payments in respect of Reserved Rights, which shall be retained by the Issuer) shall be paid into the Bond Fund and applied in accordance with the provisions of the Bond Resolution or, if the Bonds have been fully paid (or provision for payment thereof has been made in accordance with the provisions of the Bond Resolution) and any and all fees and expenses due have been paid, to the Issuer, or if the Company has no remaining liability to the Issuer, shall be repaid to the Company.

(e)     The exercise by the Issuer of remedies hereunder shall be as authorized pursuant to the terms of the Bond Resolution, including without limitation the Reserved Rights.

Section 10.3 No Remedy Exclusive. No remedy herein conferred upon or reserved to the Issuer is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity, by statute or by virtue of any other agreement or instrument. No delay or omission to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. To entitle the Issuer to exercise any remedy reserved to it in this Article, it shall not be necessary to give any notice, other than such notice as may be herein expressly required. The Holder of the Bond, subject to the provisions of the Bond Resolution, shall be entitled to the benefit of all covenants and agreements herein contained.

Section 10.4 Agreement to Pay Attorneys' Fees and Expenses. In the event the Company should default under any of the provisions of this Agreement and the Issuer should employ attorneys or incur other expenses for the collection of amounts payable under Section 5.3 hereof or the enforcement of performance or observance of any obligation or agreement on the part of the Company herein contained, the Company agrees that it will on demand therefor pay to the Issuer the fee or fees of such attorneys actually incurred and such other reasonable expenses so incurred by the Issuer.

Section 10.5 No Additional Waiver Implied by One Waiver. In the event any agreement contained in this Agreement should be breached by either party and thereafter waived by the other party, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder.

Section 10.6 Waiver of Appraisement or Valuation. If the Company should default under any of the provisions of this Agreement, the Company hereby waives, to the extent it may lawfully do so, the benefit of all appraisements, valuation, stay, extension, or redemption laws now or hereafter in force, and all right to appraisement and redemption to which it may be or become entitled.

24

## ARTICLE XI

## MISCELLANEOUS

Section 11.1 Immunity of Directors, Members, Officers, and Employees of Issuer. No recourse shall be had for the enforcement of any obligation, covenant, promise or agreement of the Issuer contained in this Agreement or for any claim based hereon or otherwise in respect hereof, or upon any obligation, covenant, promise or agreement of the Issuer contained in the Bond Documents, against any governor, director, member, officer or employee, as such, in his or her individual capacity, past, present or future, of the Issuer or of any successor body, whether by virtue of any constitutional provision, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise, it being expressly agreed and understood that this Agreement and the Bond Documents are solely corporate obligations of the Issuer payable only from the Security, and that no personal liability whatsoever shall attach to, or be incurred by, any director, member, officer or employee, as such, past, present or future, of the Issuer or of any successor body, either directly or through the Issuer or any successor body, under or by reason of any of the obligations, covenants, promises or agreements entered into between the Issuer and the Company whether contained in this Agreement or in the Bond Documents or to be implied herefrom or therefrom as being supplemental hereto or thereto, and that all personal liability of that character against every such director, member, officer and employee is, by the execution of this Agreement and as a condition to, and as part of the consideration for, the execution of this Agreement, expressly waived and released. The immunity of directors, members, officers, and employees of the Issuer under the provisions contained in this Section shall survive the completion of the Project and the termination of this Agreement.

Section 11.2 Captions. The captions or headings in this Agreement are for convenience only and in no way define, limit, or describe the scope or intent of any provisions of this Agreement.

Section 11.3 Notices. All notices, certificates or other communications hereunder shall be sufficiently given and shall be deemed given when (i) received by U.S. mail; (ii) personally delivered to the intended recipient (or an officer of the intended recipient); (iii) sent by certified first-class mail, return receipt requested, postage prepaid; or (iv) sent by recognized overnight courier service, addressed as provided in the Bond Resolution. Notices may be given by email where expressly provided in this Agreement. A notice mailed as provided in this Section shall be deemed received upon actual receipt. The Issuer and the Company may, by notice given hereunder, designate any further or different addresses to which subsequent notices, certificates or other communications shall be sent. The Issuer will respond in writing to any request by the Company for a consent required under the terms of this Agreement within 30 days. The Issuer and the Company may, by notice given hereunder, designate any further or different addresses to which subsequent notices, certificates or other communications shall be sent.

To the Issuer:             Decatur County-Bainbridge Industrial Development Authority
                           100 Boat Basin Circle
                           Bainbridge, GA 39818
                           Attention: Executive Director
                           Email: rm@bainbridgedecaturga.com

With a copy to:            Conger & Smith Attorneys At Law, LLC
(not notice)               218 E. Water Street
                           Bainbridge, Georgia 39817
                           Attention: B. Thomas Conger, Esq.
                           Email: tomconger@bellsout.net

With a copy to:            King Kozlarek Law, LLC
(not notice)               Post Office Box 565
                           Greenville, South Carolina 29602-0565
                           Attention: Michael E. Kozlarek, Esq.

25

Email: michael@kingkozlarek.com

To the Company:

Safer Human Medicine, Inc.
General Counsel
Attn: David Johst
Email: Dave.johst@saferhm.com

with concurrent copies to (does not constitute notice):

Savills Inc.
1252 Ingerson Road
Arden Hills, Minnesota 55112
Attn: Ms. Ann Marie Collins
Email: ACollins@savills.us

and

Walter E. Jones, Esq.
Balch & Bingham LLP
Email:  wjones@balch.com
30 Ivan Allen, Jr. Boulevard NW
Suite 700
Atlanta, Georgia 30308
Telephone: 404.962.3540

Section 11.4. Estoppel Certificates. Upon 10 Business Days' written request of the Company, the Issuer will, at the expense of the Company, provide a statement to any assignee or lender of the Company concerning, to the best of its knowledge, (i) the outstanding amount of the Bonds; (ii) whether a default exists under this Agreement or the other Bond Documents, and if so specifying the nature of such default; (iii) whether this Agreement or the Bond Documents have been amended, and if so, specifying the amendments; and (iv) any other matter concerning this Agreement or the Bond Documents reasonably requested by the Company.

Section 11.5 Binding Effect. This Agreement shall inure to the benefit of and shall be binding upon the Issuer, the Company and their respective successors and assigns in accordance with the terms hereof.

Section 11.6 Severability and Governing Law. It is the intention of the parties hereto in the event any provision of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof, and that this Agreement shall be governed exclusively by the applicable laws of the State.

Section 11.7 Amounts Remaining in Funds. It is agreed by the parties hereto that certain amounts remaining in the Bond Fund and the Project Fund upon expiration or earlier termination of this Agreement, after payment in full of the Bond (or provision for payment thereof having been made in accordance with the provisions of the Bond Resolution), and all other amounts owing hereunder or under the Bond Resolution, shall be paid to the Company.

Section 11.8 Amendments, Changes and Modifications. Except as otherwise provided in this Agreement or in the Bond Resolution, subsequent to the issuance of the Bond and prior to its payment in full (or provision for the payment thereof having been made in accordance with the provisions of the Bond Resolution), this Agreement may not be effectively amended, changed, modified, altered or terminated without the written consent of the Company and the Issuer, and such other parties as provided for in Article

26

VIII of the Bond Resolution.

Section 11.9 Execution in Counterparts. This Agreement may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

Section 11.10 Net Rents. The rents under this Agreement shall be deemed to be "net net net," and the Company shall pay absolutely net during the Term the rents and other amounts to be paid hereunder, without abatement, deduction or set-off other than those herein expressly provided.

Section 11.11 Time of the Essence. Time is of the essence hereof.

Section 11.12. The Rights of Issuer. Any provision hereof to the contrary notwithstanding, if the Company requests and provides for the approval and/or execution by the Issuer of any document or instrument, such as a security instrument in favor of any lender, estoppel certificate, subordination agreement, non-disturbance and attornment agreement, assignment, transfer agreement, or, including without limitation, any similar or dissimilar document or instrument transferring or assigning any and all of the Company's rights under the Project Agreement and the other Bond Documents, in addition to all other rights of the Issuer, the form and substance of the same shall be subject to the approval of the Chairman of the Issuer, such approval not to be unreasonably withheld, conditioned, or delayed, and, at the expense of the Company, the preparation of or review of same by counsel to the Issuer. Notwithstanding any provision hereof to the contrary, in no event may any such document or instrument pledge, assign, waive, release, subordinate or otherwise affect the Issuer's Reserved Rights or its rights under the Project Agreement. Notwithstanding any provision of this Agreement to the contrary, the Issuer's Reserved Rights under this Agreement and its rights under the Project Agreement and the other Bond Documents and its claims thereunder are not subject to any assignment, subordination, release, or waiver in favor of any lender or any other Person or entity. Rather, the Issuer is, without limitation, free to assert against the Company and its successors any claim it has under the Reserved Rights or such other rights, and to realize on any such claim and to exercise any remedy thereunder against the Company and its successors and the assets and property of the Company and its successors, including, without limitation, the Project, and, without limitation, may cause liens or encumbrances to be placed on the assets and property of the Company and its successors, including, without limitation the Project, in connection therewith.

Section 11.13 No Liability of Issuer; No Charge Against Issuer's Credit. **NOTWITHSTANDING ANYTHING TO THE CONTRARY, AND EXCEPT AS EXPRESSLY SET FORTH IN THE PROJECT AGREEMENT, ANY LIABILITY FOR THE PAYMENT OF MONEY AND ANY OTHER LIABILITY OR OBLIGATION WHICH ISSUER MAY INCUR UNDER OR PURSUANT TO THIS AGREEMENT, THE BOND RESOLUTION OR OTHER BOND DOCUMENTS SHALL NOT CONSTITUTE ITS GENERAL OR PECUNIARY OBLIGATION BUT SHALL CONSTITUTE A SPECIAL OR LIMITED OBLIGATION OF THE ISSUER REPRESENTING A CLAIM ONLY AGAINST THE REVENUES DERIVED HEREUNDER AND UNDER THE BOND RESOLUTION OR OTHER BOND DOCUMENTS.**

Section 11.14 Conflicting Provisions. In the event that there exists a conflict between any term, condition, or provision contained within this Agreement, and in any term, condition, or provision contained within the Project Agreement, the term, condition, or provision contained within the Project Agreement shall control.

[ONE SIGNATURE PAGE AND FOUR EXHIBITS FOLLOW]
[REMAINDER OF PAGE INTENTIONALLY BLANK]

**IN WITNESS WHEREOF**, the Issuer and the Company have caused this Rental Agreement to be executed in their respective names and their respective seals to be hereunto affixed and attested by their duly authorized officers, all as of the date first above written.

**DECATUR COUNTY-BAINBRIDGE
INDUSTRIAL DEVELOPMENT AUTHORITY**

**[SEAL]**

By:_____
      Chairman

**ATTEST**:

By:_____
    Acting Secretary

Signed, sealed, and delivered in the presence of:

_____

Unofficial Witness

_____

Notary public
Commission Expiration Date:_____

[Notary Seal]

**SAFER HUMAN MEDICINE, INC.**

By:_____
    Name:
    Title:

Signed, sealed, and delivered in the presence of:

_____

Unofficial Witness

_____

Notary public
Commission Expiration Date:_____

[Notary Seal]

## EXHIBIT A

### PROPERTY DESCRIPTION

⦀⦀

## EXHIBIT B

### PROJECT DESCRIPTION

COMPANY:            Safer Human Medicine, Inc.

DESCRIPTION:        Certain animal husbandry and related facilities of the Company on the Land
                    described on Exhibit A hereto in Decatur County, Georgia in order to promote
                    economic development and job creation and to facilitate a property tax incentive
                    for the Company. The Project is to include land, buildings and furniture, fixtures,
                    machinery, equipment, and related property, to be more fully described in
                    Requisitions submitted by the Company from time to time and shown on one or
                    more bills of sale from the Company to the Issuer.

TENTATIVE NON-BINDING PROJECT BUDGET:

Land:    $ []
Buildings: $ []
Equipment: $[]
Total: $ []

## EXHIBIT C

### FORM OF REQUISITION AND ADVANCE REQUEST

#### REQUISITION [AND BILL OF SALE]

DECATUR COUNTY-BAINBRIDGE INDUSTRIAL DEVELOPMENT AUTHORITY
TAXABLE REVENUE BONDS
(PROJECT LIBERTY)
SERIES 2023

Decatur County-Bainbridge Industrial Development Authority          Requisition No. _____
100 Boat Basin Circle
Bainbridge, GA 39818
Attention: Executive Director

[], as Holder of the Bond
[]
[]
Attention: []

    This is a requisition in the amount of $_____ for payment to the person and address or account shown on the attached schedule, pursuant to Section 4.4 of that certain Rental Agreement ("Agreement") dated as of December 1, 2023, between the undersigned Safer Human Medicine, Inc. ("Company") and the Decatur County-Bainbridge Industrial Development Authority ("Issuer") relating to the proceeds (whether derived directly or indirectly from the issuance of the Bond, as defined herein) from the sale of the Issuer's bond described above ("Bond"). Capitalized terms used herein shall have the meanings ascribed to such terms in the Agreement.

    In connection with this Requisition, the Company does hereby certify as follows:

    1.    Obligations in the stated amount have been paid or incurred in connection with the issuance of the Bond or the direct or indirect acquisition and construction, in whole or in part, of the Project, and attached are copies of invoices or other summary description of the property directly or indirectly acquired, in whole or in part, and its cost.

    2.    Such obligations are Costs of the Project, are proper charges against the Project Fund and have not been the basis of any previous disbursement from the Project Fund.

    3.    The principal amount of the Bond is $300,000,000, in one or more series, and, including amounts requisitioned in this Requisition, $_____ has been requisitioned pursuant to the Agreement. $_____ remains for requisition under the Agreement.

    This document constitutes a request for an "Advance" as described in that certain Bond Purchase Agreement, dated as of December 1, 2023, by and between the Company and the Issuer. Accordingly, the Company hereby requests, pursuant to the Bond Purchase Agreement *(check one of the following).*

_____ the following amounts be disbursed in cash pursuant to the Bond Purchase Agreement, in accordance with the following payment instructions to the following parties:

| Name of Payee | Nature of Cost of Project | Amount |
|---|---|---|

Payment Instructions:

or that:

the Company has incurred Costs of the Project in the amount set forth above, and directs that said amount be treated as an Advance by the Purchaser to the Project Fund for the Bond, a purchase by the Issuer from the Purchaser of such property at such cost, and a reimbursement to the Company for such costs.

Title to all improvements to the Land for the Project, including all real property described on any summary or other documents attached to this Requisition, was transferred to the Issuer as of the date such real property was acquired, as provided in the Rental Agreement.

Title to all personal property constituting a portion of the Project, including all personal property described on the summary or other documents attached to this Requisition, was transferred to the Issuer as of the date such property was located on the Land, as provided in that certain Bill of Sale and Assignment dated January [], 2024 ("Bill of Sale") by the Company in favor of the Issuer. Furthermore, to the extent that the property described on the summary or other documents attached to this Requisition constitutes personal property, this Requisition shall constitute a Bill of Sale, and the Company does hereby bargain, sell, quitclaim, assign, transfer and convey, without warranty of any kind, to Issuer all of its right, title and interest in and to each and every item of such personal property for inclusion as part of the Project rented to the Company pursuant to the Agreement.

This Requisition and Advance Request is submitted on [Month] [Day], [Year].

SAFER HUMAN MEDICINE, INC.


By: _____
Company Representative

## EXHIBIT D

### PAYMENT IN LIEU OF TAXES SCHEDULE

1.  The Company and the Public Authorities anticipate the Company will make investment in two tranches, (a) beginning in calendar year 2024/2025 and ending in or before calendar year 2031/2032, and (b) beginning in calendar year 2031/2032 and ending in or before calendar year 2038/2039.

2.  Each tranche of the Project will receive a 20-year property tax savings incentive beginning in the year, for the applicable tranche, in which property becomes subject to *ad valorem* real/personal property tax (as described in item 4, below). To calculate the payments in lieu of tax owed by the Company pursuant to Section 8.4 of the Project Agreement, the Applicable Percentage for the beginning year of the respective tranche is to be multiplied by the taxable value of the fee interest of the Project in such year at and after the initial investment in that applicable tranche has become subject to *ad valorem* property tax. The tax savings incentive to the Company is expressed in terms of the Abatement Percentage, *i.e.*, the percentage savings of the *ad valorem* real/personal property tax that would otherwise be due.

| Year | Applicable Percentage | Abatement Percentage |
|------|-----------------------|----------------------|
| 1-10 | 0% | 100% |
| 11 | 9% | 91% |
| 12 | 18% | 82% |
| 13 | 27% | 73% |
| 14 | 36% | 64% |
| 15 | 45% | 55% |
| 16 | 54% | 46% |
| 17 | 63% | 37% |
| 18 | 72% | 28% |
| 19 | 81% | 19% |
| 20 | 90% | 10% |
| 21 and thereafter | 100% | 0% |

3.  The Company shall pay normal property taxes with respect to property not titled to the Authority, subject to other exemptions from taxation that may be available to the Company or as set forth in this Agreement otherwise.

4.  Year 1, for the initial tranche of Capital Expenditures invested with respect to the Project (Tranche 1 Capital Investment), shall be the calendar year commencing on the January 1 following the year in which commercial production commences (or Leased Property (as defined in the Project Agreement) is otherwise "placed in service") for the Tranche 1 Capital Investment. During construction of the initial tranche of Project Improvements and prior to the commencement of commercial production, there shall be no *ad valorem* taxes or payments in lieu of tax payable with regard to the initial tranche.

5.  Year 1, for the additional tranche of Capital Expenditures invested with respect to the Project (Tranche 2 Capital Investment), shall be the calendar year commencing on the January 1 following the year in which commercial production commences (or Project is otherwise "placed in service") for the Tranche 2 Capital Investment. During construction of the additional tranche of Project Improvements and prior to the commencement of commercial production, there shall be no *ad valorem* taxes or payments in lieu of tax payable with regard to the additional tranche.

**EXHIBIT D**
**BOND PURCHASE AGREEMENT**
[SEE ATTACHED]