# EXHIBIT G

**PROJECT AGREEMENT**

**by and between**

**SAFER HUMAN MEDICINE, INC.**

**and**

**DECATUR COUNTY-BAINBRIDGE INDUSTRIAL DEVELOPMENT AUTHORITY**
**CITY OF BAINBRIDGE, GEORGIA**
**DECATUR COUNTY, GEORGIA**
**DECATUR COUNTY SCHOOL DISTRICT**
**DECATUR COUNTY TAX COMMISSIONER**
**DECATUR COUNTY BOARD OF TAX ASSESSORS**

**Effective Date:**

**December 11, 2023**

Table of Contents

**ARTICLE I DEFINED TERMS**................................................................................................2

**ARTICLE II COMPANY COMMITMENT**..........................................................................5

    Section 2.1    Investment and Employment Commitments of the Company ...................5
    Section 2.2    Local Recoupment. ...................................................................................5
    Section 2.3    Notice of Commencement of Commercial Production .............................6
    Section 2.4    Company Reporting Commitment; Recoupment Payment.......................7
    Section 2.5    Subsequent Compliance..........................................................................7
    Section 2.6    Extension of Calculation Date..................................................................8

**ARTICLE III DESIGNATION OF COORDINATOR; GENERAL TERMS**......................8

    Section 3.1    Designation of Coordinator ......................................................................8
    Section 3.2    Business License Fees ..............................................................................8
    Section 3.3    Georgia Agricultural Tax Exemption (GATE) ........................................8
    Section 3.4    Company Contractors and Suppliers........................................................8

**ARTICLE IV THE PROJECT SITE; SITE PREPARATION**..............................................9

    Section 4.1    Project Site................................................................................................9
    Section 4.2    Reimbursement for Surveys and Studies.................................................9
    Section 4.3    Project Site Clearing.................................................................................9
    Section 4.4    Road Improvements and Curb Cuts.........................................................9
    Section 4.5    Sink Holes...............................................................................................10

**ARTICLE V CONSTRUCTION AND FINANCING OF THE PROJECT IMPROVEMENTS .....10**

    Section 5.1    [Reserved] ..............................................................................................10
    Section 5.2    Project Improvements and Bond. ...........................................................10

**ARTICLE VI**     ...................................................................................................11

**[RESERVED]**     ...................................................................................................11

**ARTICLE VII INFRASTRUCTURE**...................................................................................11

    Section 7.1    Water.......................................................................................................11
    Section 7.2    Wastewater..............................................................................................12
    Section 7.3    Natural Gas..............................................................................................12
    Section 7.4    Electricity................................................................................................13
    Section 7.5    Telecommunications. ..............................................................................13
    Section 7.6    City Failure to Timely Perform...............................................................14

**ARTICLE VIII TAX INCENTIVES**.....................................................................................14

    Section 8.1    Job Tax Credits; Tax Exemptions ..........................................................14
    Section 8.2    Local Freeport Exemption......................................................................14
    Section 8.3    [Intentionally Omitted]...........................................................................15
    Section 8.4    Change in Law ........................................................................................15

**ARTICLE IX LOCAL INCENTIVES**..................................................................................16

    Section 9.1    Assistance with Employment Incentive Programs..................................16

**ARTICLE X STATE INCENTIVES**....................................................................................16

    Section 10.1    Reserved.................................................................................................16
    Section 10.2    Other State Incentives............................................................................16

**ARTICLE XI** ...............................................................................................................16

**ARTICLE XII MISCELLANEOUS** ........................................................................16

Section 12.1    Authorization.............................................................................16
Section 12.2    Contingencies.............................................................................16
Section 12.3    Intellectual Property .................................................................17
Section 12.4    Reserved.....................................................................................17
Section 12.5    Governing Law...........................................................................17
Section 12.6    Severability ................................................................................17
Section 12.7    Notices ........................................................................................17
Section 12.8    Publicity and Trade Secrets.....................................................19
Section 12.9    Assignment.................................................................................19
Section 12.10   Further Assurances....................................................................20
Section 12.11   Specific Performance and Damages.........................................20
Section 12.12   Conflicts.....................................................................................20
Section 12.13   Survival of Representations .....................................................20
Section 12.14   Term of Agreement ...................................................................20
Section 12.15   No Third-Party Beneficiaries ..................................................20
Section 12.16   Article and Section Titles and Headings.................................20
Section 12.17   Incorporation of Exhibits, Annexes and Schedules ...............20
Section 12.18   Entire Agreement ......................................................................20
Section 12.19   Amendments and Waivers ........................................................20
Section 12.20   Cost and Expense ......................................................................21
Section 12.21   Construction...............................................................................21
Section 12.22   Binding Effect ............................................................................21
Section 12.23   Counterparts...............................................................................21
Section 12.24   No Personal Liability of Representatives of the Authority. ...21
Section 12.25   No Personal Liability of Representatives of Company............22
Section 12.26   Extension of Deadlines. ............................................................22

### LIST OF EXHIBITS

EXHIBIT A    Project Site
EXHIBIT B    Permitted Encumbrances
EXHIBIT C    Project Schedule
EXHIBIT D    Utility Requirements
EXHIBIT E    Road Infrastructure
EXHIBIT F    Payments in Lieu of Tax
EXHIBIT G    State Incentives

## PROJECT AGREEMENT

**THIS PROJECT AGREEMENT** ("Agreement") is hereby made and entered into as of December 11, 2023 ("Effective Date"), by and between **SAFER HUMAN MEDICINE, INC.**, a Delaware corporation ("Company"), the **DECATUR COUNTY-BAINBRIDGE INDUSTRIAL DEVELOPMENT AUTHORITY**, a constitutional development authority ("Authority") for the City of Bainbridge, Georgia, and Decatur County, Georgia, the **CITY OF BAINBRIDGE, GEORGIA**, a municipal corporation of the State of Georgia ("City"), **DECATUR COUNTY, GEORGIA**, a political subdivision of the State of Georgia ("County"), the **DECATUR COUNTY SCHOOL DISTRICT** ("District"), the **DECATUR COUNTY TAX COMMISSIONER** ("Commissioner"), and the **DECATUR COUNTY BOARD OF TAX ASSESSORS** ("Tax Assessors" and together with the Authority, the City, the County, and the Commissioner, the "Public Authorities").

### W I T N E S S E T H:

**WHEREAS**, the Public Authorities support and encourage business and industrial development in the City, the County, and State of Georgia ("State");

**WHEREAS**, the Company is in the business of developing and operating animal husbandry-related facilities related to medical research and development;

**WHEREAS**, the Public Authorities are desirous of having the Company create its operations with supporting functions in the City and County, and the Company has determined to expand into and locate such operations in the City and County;

**WHEREAS**, the Authority has determined to provide to the Company approximately 200 acres of developable land in the Downrange Industrial Park ,which land is collectively shown or described on Exhibit A hereto ("Project Site"), for a nominal cost, for the initial construction, improvement and equipping, by the Company of the Project (as defined below), which will be owned by the Authority and leased to and utilized by the Company with respect to the creation and location of its production operations with supporting functions in the City and County, all on the terms more fully set forth herein and the Rental Agreement (as defined below);

**WHEREAS**, the Public Authorities have made specific proposals to the Company for the purpose of inducing the Company to establish the Project in the City and County;

**WHEREAS**, in consideration thereof, the Company has agreed to make a capital investment of approximately $270,000,000 in the Project and to achieve an FTE Count (as defined below) of approximately 263, on the terms and conditions set forth herein; and

**WHEREAS**, on the Effective Date, the commitments contained in this Agreement shall become legally binding obligations of the Public Authorities, whose commitments are made in consideration for the Company's decision to locate the Project at the Project Site and its investment and employment commitments;

**NOW, THEREFORE**, upon and in consideration for the mutual promises and covenants contained herein and for other valuable consideration, the receipt, adequacy, and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

# ARTICLE I

## DEFINED TERMS

As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"**Abatement Percentage**" has the meaning set forth in Exhibit F to this Agreement.

"**Additional Financing**" has the meaning set forth in Section 5.2(b) of this Agreement.

"**Affiliate**" means any person or entity (as used herein, the term "entity" includes, without limitation, any public body) that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with a specified person or entity. As used herein, the term "control" of a person or entity means the possession, directly, of the power (i) to vote 50% or more of the voting securities of such person or entity (on a fully diluted basis) having ordinary power to vote in the election of the governing body of such person or entity, or (ii) to direct or cause the direction of the management or policies of a person or entity, whether through the ownership of voting securities or membership interests, by contract or otherwise.

"**Average Commitment Percentage**" means the percentage obtained by dividing the sum of the Capital Investment Goal Percentage and the Base Employment Goal Percentage by 2.

"**Base Employment Goal**" has the meaning set forth in Section 2.1(b) of this Agreement.

"**Base Employment Goal Percentage**" means the percentage obtained by dividing the highest FTE Count achieved during any month occurring prior to the Calculation Date by the Base Employment Goal.

"**Bond**" has the meaning set forth in Section 5.2(b) of this Agreement.

"**Bond Documents**" has the meaning set forth in Section 5.2 of this Agreement.

"**Bond Fee**" has the meaning set forth in Section 5.2(b) of this Agreement.

"**Calculation Date**" means each of the First Calculation Date or the Second Calculation Date, as applicable in the context in which this term appears in this Agreement.

"**Capital Expenditures**" means all expenditures made with respect to the Project (whether on or off the Project Site) that, under general accounting principles are, or have been, capitalized in connection with the Project, including applicable so-called "hard costs" and "soft costs". The Parties expressly acknowledge and agree that "Capital Expenditure" shall include, without limitation: (i) expenditures made for the benefit of, associated with, or in support of, the Project, by parties other than the Company, or with funding provided by any such other party, including, without limitation, expenditures made by, or funds provided by, any of the Public Authorities, the State (or any of its departments or agencies), the United States of America (or any of its departments or agencies), any railroad, or any lender of the Company, and (ii) rental or other sums paid under a capital lease for which the leased property would be subject to ad valorem property taxes, subject to any abatements provided herein.

"**Capital Investment Goal**" has the meaning set forth in Section 2.1(b) of this Agreement.

"**Capital Investment Goal Percentage**" means the percentage obtained by dividing the aggregate Capital Expenditures made with respect to the Project through the Calculation Date by the Capital Investment Goal.

"**Economic Incentive Amount**" means (i) for the First Calculation Date and Tranche 1 Capital Investment, an amount equal to $2,000,000 (value of the real property for the Project) plus $500,000 (value of clearing the real property for construction), less any amounts received by the Authority in grants or from other third party sources to offset the cost of land clearing, plus the difference between (A) the payments in lieu of taxes and/or ad valorem tax payments, as the case may be, made by the Company in all years prior to the Calculation Date pursuant to Section 8.4 of this Agreement and (B) the ad valorem taxes which would have been owed by the Company for such years in the absence of this Agreement, and (ii) for the Second Calculation Date (as defined herein) and the Tranche 2 Capital Investment, an amount equal to the difference between (A) the payments in lieu of taxes and/or ad valorem tax payments, as the case may be, made by the Company in the seven calendar years immediately prior to the Second Calculation Date pursuant to Section 8.4 of this Agreement, and (B) the ad valorem taxes which would have been owed by the Company for such years in the absence of this Agreement.

"**Effective Date**" means the date written in the preamble of this Agreement.

"**First Calculation Date**" means December 31 of the seventh (7th) full year after the Company delivers its Notice of Commencement to the Authority as to the Tranche 1 Capital Investment, subject to the provisions of Section 2.5 of this Agreement. As an example, if the Company delivers its Notice of Commencement on December 1, 2024, then the First Calculation Date would be December 31, 2031.

"**Force Majeure**" shall mean an impossibility to perform an obligation or actual delays in the performance of an obligation (excluding the payment of a monetary sum) resulting from a failure or inability to secure materials, supplies, or labor through ordinary sources; strikes or other labor troubles; new governmental restrictions or limitations enacted after the Effective Date; war or other national emergency, civil riot, declared state of emergency or public health emergency, epidemic, pandemic (including, without limitation, COVID-19); government-mandated quarantine, stay-at-home orders, shelter-in-place orders, travel bans, government-mandated closures; accidents, fire, damage or other casualties; natural disasters, including without limitation floods, earthquakes and hurricanes; embargoes, import or export restrictions, trade agreements or changes in international trade regulations or policies that adversely affect the Company's ability to source non-human primates.

"**Freeport Exemption**" has the meaning set forth in Section 8.2 of this Agreement.

"**FTE Count**" shall mean the aggregate number of hours worked in a given calendar month by all Project Employees divided by 152 hours. For instance, if in a given calendar month the aggregate number of hours worked by Project Employees is 49,704 hours, then the FTE Count for such month would be 327.

"**Intellectual Property**" means all of the following in any jurisdiction throughout the world: (i) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto and all patents, patent applications and patent disclosures, together with all reissues, continuations, continuations-in-part, revisions, extensions and reexaminations thereof; (ii) all trademarks, service marks, trade dress, logos, slogans, trade names, corporate names and Internet domain names, together with all combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith; (iii) all copyrightable works, all copyrights and all applications, registrations and renewals in connection therewith; (iv) all mask works and all applications, registrations and renewals in connection therewith; (v) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information and business and marketing plans and proposals); (vi) all computer software (including source code, executable code, data, databases and related documentation); (vii) all advertising and promotional materials; (viii) all other proprietary rights; and (ix) all copies and tangible embodiments thereof (in whatever form or medium).

"**Leased Equipment**" has the meaning set forth in Section 5.2(b) of this Agreement.

- 3 -

"**Leased Property**" means collectively the Leased Real Property and the Leased Equipment.

"**Leased Real Property**" has the meaning set forth in Section 5.2(b) of this Agreement.

"**Liability**" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due), including any liability for Taxes.

"**Local Recoupment Amount**" means a sum of money equal to the Economic Incentive Amount multiplied by the Shortfall Percentage.

"**Notice of Commencement**" means those certain notices of commencement of commercial production to be provided by the Company to the Authority pursuant to Section 2.4 and Exhibit G of this Agreement.

"**Permit**" means any permit, license, order, approval, or authorization issued under any law.

"**Permitted Encumbrances**" means those matters set forth on Exhibit B of this Agreement.

"**PILOT Agreement**" has the meaning set forth in the Rental Agreement.

"**Project**" means the Project Site and Project Improvements, as well as any furniture, new and existing equipment and machinery installed therein or used in connection therewith, to be utilized by the Company for its operations with supporting functions related to animal husbandry in the support of medical research, in the City and County and related facilities and property including any additional buildings and improvements located on the Project Site and any expansions to the Project.

"**Project Employees**" shall mean employees of the Company (including, without limitation, employees leased by the Company) working at or from, or assigned to, the Project Site at any given point in time.

"**Project Improvements**" means a group of animal husbandry facilities and other related facilities and other building(s) and improvements totaling approximately 1.75 million square feet as may be appropriate on the Project Site, together with building fixtures, systems, machinery and building equipment (collectively, "Project Improvements").

"**Project Schedule**" has the meaning set forth in Section 7.1 of this Agreement, and as shown or described in Exhibit C attached hereto.

"**Project Site**" has the meaning set forth in the recitals to this Agreement.

"**PSA**" has the meaning set forth in Section 4.1(c) of this Agreement.

"**Rental Agreement**" has the meaning set forth in Section 5.2 of this Agreement.

"**Second Calculation Date**" means December 31 of the seventh (7th) full year after the Company delivers its Notice of Commencement to the Authority as to the Tranche 2 Capital Investment, subject to the provisions of Section 2.5 of this Agreement.  As an example, if the Company delivers its Notice of Commencement on December 1, 2031, then the Second Calculation Date would be December 31, 2038.

"**Self-Help Right**" has the meaning set forth in Section 7.6 of this Agreement.

"**Shortfall Percentage**" means the percentage obtained by subtracting the Average Commitment Percentage from 80%, if such calculation would produce a positive number.

"**Site Construction**" means the development, design, engineering, construction, equipping and start-up completion of the Project.

"**State**" has the meaning set forth in the recitals to this Agreement.

"**Tax**" or "**Taxes**" means any federal, State, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including under § 59A of the Internal Revenue Code of 1986, as amended), custom duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or not.

"**Tranche 1 Capital Investment**" means the first $164.53 million in Capital Expenditures invested with respect to the Project as described in Section 2.1 of this Agreement.

"**Tranche 2 Capital Investment**" means, in addition to the Tranche 1 Capital Investment, the additional $105.53 million in Capital Expenditures invested with respect to the Project as described in Section 2.1 of this Agreement.

**ARTICLE II**

**COMPANY COMMITMENT**

Section 2.1     Investment and Employment Commitments of the Company.

(a)     The Company commits to locate and operate the Project on the Project Site.

(b)     In consideration of this Agreement, the Company intends to make at least, in aggregate, $270,000,000 of Capital Expenditures in the Project, made up of two tranches of investment as follows: (a) $164.53 million, as determined on or before the First Calculation Date, and (b) an additional $105.53 million, as determined on or before the Second Calculation Date (each, as of or before the applicable Calculation Date, the "Capital Investment Goal"), and to achieve an FTE Count of not less than (a) 167 in any month no later than the First Calculation Date, and (b) an additional 96 in any month no later than the Second Calculation Date (each, as of the applicable Calculation Date, "Base Employment Goal"). Notwithstanding anything herein to the contrary, in calculating jobs and capital investment hereunder, the Company may include all jobs and capital investment made at or related to the Project Site, whether made by the Company or another entity, including without limitation the State or its agencies, other than the Authority. Used equipment and machinery brought into the County by the Company will count towards the Company's Capital Investment Goal at the book value thereof. The value of any capital leases, any expansion to the Project Improvements or any new Project Improvements on the Project Site will count towards the Company's Capital Investment Goal.

Section 2.2     Local Recoupment. The Company agrees that, if on or before the respective Calculation Date, the investment and employment commitments set forth in Section 2.1(b) above have not been met, the Company shall pay all or a portion of the Economic Incentive Amount received in connection with the Project (as described in Section 8.4 herein), as more fully described below.

Section 2.3     Local Recoupment Formula. Compliance with the investment and employment commitments as set forth in Section 2.1(b) for each of the two seven-year investment tranches and the calculation of any Local Recoupment Amount, shall be determined based upon the following:

(a)     If the Company does not achieve an Average Commitment Percentage equal to or in excess of 80% on or before each applicable Calculation Date, then the Company shall pay to the Decatur County Tax Commissioner ("Tax Commissioner") an amount equal to the Local Recoupment Amount. To the

extent the Capital Expenditures invested as of the First Calculation Date exceed the Tranche 1 Capital Investment Goal, then the surplus amount shall be credited to the Capital Expenditures for purposes of calculating any Local Recoupment Amount as of the Second Calculation Date ("Capital Surplus Credit").

(b)    First Calculation Date.  To calculate the Local Recoupment Amount, if any, the highest FTE Count achieved in any one month in the period prior to the First Calculation Date (the "Tranche 1 Term") and the total of all Capital Expenditures made in the Tranche 1 Term, will be used.

*Example:* The Company's employment target is 80% of 167 FTEs, or 134 FTEs. The Company's capital investment target is 80% of $164,530,000, or $131,624,000.

In Month 52 of the Tranche 1 Term, the highest FTE Count achieved in any one month was 129 FTEs, thus achieving 96% of the target.  For the entire Tranche 1 Term, there were total Capital Expenditures of $135,000,000, or 103% of the capital investment target. To determine whether any Local Recoupment Amount is due, you would add 96% and 103% and divide by 2 to establish that the company achieved an Average Commitment Percentage of 99.5%.  Because the Average Commitment Percentage exceeds the 80% target, no Local Recoupment Amount would be due.

129 ÷ 134 = .96 (96%)

$135,000,000 ÷ $131,624,000 = 1.03 (103%)

103 + 96 = 199 ÷ 2 = .995 (99.5% Average Commitment Percentage)

99.5% > 80% = No Local Recoupment Amount Due

(c)    Second Calculation Date.  For tranche 2, to calculate the Local Recoupment Amount, if any, the highest FTE Count achieved in any one month between the First Calculation Date and the Second Calculation Date (the "Tranche 2 Term") and the total of all Capital Expenditures invested during the Tranche 2 Term, will be used.

*Example:* The Company's employment target for the Tranche 2 Term is 80% of 263 FTEs, or 210 FTEs. The Company's capital investment target for the Tranche 2 Term is 80% of $105,530,000, or $84,424,000.

In Month 111, falling within the Tranche 2 Term, the highest FTE Count achieved in any one month was 210 FTEs, thus achieving 100% of the target.  For the Tranche 2 Term, there were total Capital Expenditures of $61,207,400 (including any Capital Surplus Credit) or 58% of the tranche 2 capital investment target. To calculate the Local Recoupment Amount, you add 100% and 58% and divide by 2 to establish that the company achieved an Average Commitment Percentage of 79%.  The 80% target less the 79% Average Commitment Percentage would yield a Shortfall Percentage of 1% and the Company would owe a Local Recoupment Amount equal to 1% of the Economic Incentive Amount.

210 ÷ 210 = 1.00 (100%)

$61,207,400 ÷ $105,530,000 = .58 (58% Average Commitment Percentage)

100% + 58% = 158% ÷ 2 = 79%

80% - 79% = 1% (Shortfall Percentage)

1% x Economic Incentive Amount (Second Calculation Date) =  Local Recoupment

Amount

Section 2.4    Notice of Commencement of Commercial Production.    The Company shall provide to the Authority a written certificate within sixty (60) days of commencement of commercial production at the Project with regard to both the Tranche 1 Capital Investment and the Tranche 2 Capital Investment.

Section 2.5    Company Reporting Commitment; Recoupment Payment; Tax Abatement Penalty.

(a)  The Company shall provide to the Authority a written certificate upon satisfaction of the Capital Investment Goal (for each tranche of Capital Expenditures) and the Base Employment Goal, together with other documentation which the Authority may reasonably require to evidence satisfaction of such goals. Once the Capital Investment Goal and Base Employment Goal have been satisfied as aforesaid, the Company shall have no further obligations or liabilities under this Agreement with respect to the Capital Investment Goal and Base Employment Goal (or with respect to the Local Recoupment Amount). Nothing herein shall obligate the Company to make monthly reporting to the Authority with respect to the Capital Investment Goal or the Base Employment Goal.

(b)  If the Average Commitment Percentage does not equal or exceed 80% on or before the applicable Calculation Date for the particular tranche of capital investment, then the Company shall provide to the Authority, within thirty (30) days following the applicable Calculation Date, a written calculation of the Local Recoupment Amount, payable by the Company. If it is determined that a Local Recoupment Amount is payable by the Company for a particular tranche of capital investment, then such Local Recoupment Amount shall be paid to the Tax Commissioner in three (3) equal annual installments with the first installment thereof being due on or before the 30th day following the applicable Calculation Date, with subsequent installments being due on the same date in each of the following two (2) years.

(c)  Further, if the Average Commitment Percentage does not equal or exceed 80% on or before the applicable Calculation Date for the particular tranche of capital investment, then, in addition to the Company's payment of the Local Recoupment Amount, the Abatement Percentage (as set forth in Exhibit F to this Agreement) for years 8-20 of the tranche-specific tax abatement period shall be reduced by the Shortfall Percentage as shown in the example below:

| Non-Compliance with Average Commitment Percentage at First Calculation Date--Calculating Local Recoupment Amount and Abatement Penalty | |
|---|---|
| Economic Incentive Amount as of First Calculation Date | $1,000,000 |
| Shortfall Percentage | 4% |
| Amount to be Repaid by Company (Local Recoupment Amount) | |
| Economic Incentive Amount times Shortfall Percentage | $40,000 |
| Land and Clearing Value ($2,500,000) times Shortfall Percentage | $100,000 |
| Total Amount to be Paid by Company to Tax Commissioner (Local Recoupment Amount) | $140,000 |
| Annual Installment Payment Amounts of Local Recoupment Amount | $46,666.67 |
| % Reduction in go forward Abatement Percentage in years 11-20 (Abatement Percentage times Shortfall Percentage) | |
| Example - Year 11 Abatement Percentage equals 91% minus (91% times Shortfall Percentage) | 87.36% |

(d)  Any Local Recoupment Amount paid pursuant to this Article II will be reasonably allocated by the Tax Commissioner to the tax years during which the benefits being repaid actually accrued to the Company. The Company's obligations under this Article II with respect to the payment of the Local Recoupment Amount shall be the sole and exclusive remedy of the Public Authorities in the event that either the Capital Investment Goal and/or Base Employment Goal is not satisfied on or before the applicable Calculation Date.

Section 2.6    Subsequent Compliance.    If the Abatement Percentage is reduced as described in Section 2.5(d) above, but on a subsequent date the Average Commitment Percentage does equal or exceed 80% for the particular tranche of capital investment, then (i) any subsequent installment payment(s) of the Local Recoupment Amount for that particular tranche of capital investment, as provided for in Section 2.5(b), shall no longer be due and payable from the Company to the Tax Commissioner and (ii) for all

remaining years in the tax abatement schedule for that particular tranche of capital investment, the Abatement Percentages shall be increased to the original Abatement Percentages as set forth in in Exhibit H to this Agreement.

Section 2.7    Extension of Calculation Date. The applicable Calculation Date shall be extended on a day-for-day basis for those days the Company's ability to satisfy either the Capital Investment Goal and/or Base Employment Goal is delayed by Force Majeure. The Company shall deliver prompt written notice to the Authority (after the Company has notice of the same) in the event, and for each event, that Force Majeure will impact the Capital Investment Goal and/or Base Employment Goal.

## ARTICLE III

## DESIGNATION OF COORDINATOR; GENERAL TERMS

Section 3.1    Designation of Coordinator. Chris Hobby and/or Rick McCaskill, or each of their respective designees, or one or more successors designated by the Public Authorities in writing to the Company (each an "Authority Designee"), will coordinate the Project for the Authority through completion of Site Construction and the full delivery of the incentives outlined hereunder.

Assistance with Permits.

(a)    The Public Authorities shall, from and after the Effective Date and for the duration of the Site Construction, facilitate the timely issuance of all Permits which are under the respective jurisdiction of the County and/or the City (if applications for which are timely and properly submitted and documented by the Company) required in connection with the Project, including, without limitation, site plan approvals, erosion control Permits, construction Permits, building Permits and operating Permits, wastewater discharge Permits, stormwater discharge Permits, wetlands Permits, land disturbing activity Permits, and subdivision or platting approvals. The City and County shall cause all Permit decisions of the City and County necessary for Site Construction to be made on a fast-track basis.

(b)    The City and County shall waive, to the extent permitted by applicable law, all: (i) building permitting fees or charges and impact fees that would otherwise be payable by the Company in connection with its development, construction and equipping of the Project and (ii) utility tap or connection fees and/or utility availability or reservation fees, all for any utilities provided by the City and County, including potable domestic water, domestic waste water, natural gas, and fiber; provided, however that these waivers shall not be construed to include a waiver of any reasonable fee imposed by the Authority for any Bonds issued as contemplated by this Agreement.

Section 3.2    Business License Fees. The City and County shall waive any occupational tax or business license fee that may otherwise be payable to the City or County in connection with, or related to, the Project or its operations.

Section 3.3    Georgia Agricultural Tax Exemption (GATE). The City, County, and Authority shall use their best efforts to ensure that the Company is approved and receives its GATE certificate through the Georgia Department of Agriculture.

Section 3.5    Company Contractors and Suppliers. The Public Authorities agree that all contractors, vendors and/or suppliers retained by the Company for any portion of the Project shall be selected by and in the sole discretion of the Company.

# ARTICLE IV

## THE PROJECT SITE; SITE PREPARATION

Section 4.1    Project Site.

(a)    As of the Effective Date, the Project Site is currently owned by, or under contract to purchase with, the Authority, of which an approximately 200-acre portion will be leased to and utilized by the Company pursuant to the Rental Agreement described in Section 5.2 below. The precise location and dimensions of the approximately 200-acre Project Site shall be finally agreed upon by the Authority and the Company and will be depicted in the Rental Agreement.

(b)    As of the Effective Date, the Company (including its agents, representatives, contractors, consultants, successors and assignees) shall have a revocable license for the purposes of pedestrian, passenger and construction vehicular access, ingress and egress over, across and through the Project Site and such other rights and privileges necessary or appropriate in connection with the Company's due diligence on the Project Site as described in Section 4.1(c) below and in connection with the Company's intended development and use of the Project Site; provided, however, the Company will indemnify and hold harmless the Public Authorities from and against any loss, cost, damage, claim, expense, action or cause of action arising out of the Company's use of the aforesaid license. The Company's said revocable license shall remain in full force and effect, and shall not be revoked by the Authority, so long as this Agreement remains in effect.

(c)    The Authority and the Company have entered into a purchase and sale agreement, dated as of January ___, 2024 (as amended from time to time, "PSA"), related to the Project Site, which the Parties intend to govern the conveyance of a portion of the real property constituting the Project Site by the Authority to the Company, as well as the granting of certain easements for the benefit of the Project Site and the imposition of certain covenants and restrictions on the use of the Authority's retained real property, all as more fully set forth in the PSA.

Section 4.2    Reimbursement for Surveys and Studies.  The Authority shall reimburse the Company, from time to time, for the following fees, costs and expenses at Closing (as defined in the PSA) so long as the Company has delivered a reasonably detailed invoice therefor: (a) the fees, costs, and expenses for any ALTA-NSPA surveys or topographical surveys of the Project Site performed by contractors or subcontractors of the Company, in an amount not to exceed $[][]; (b) the fees, costs and expenses for any wetlands studies, delineations, and/or reports associated with the Project Site performed by contractors or subcontractors of the Company, in an amount not to exceed $10,000; (c) the fees, costs and expenses for any Phase I Environmental Site Assessments performed by contractors or subcontractors of the Company, in an amount not to exceed $5,000; and (d) the fees, costs and expenses for any Threatened and Endangered Species studies performed by contractors or subcontractors of the Company, in an amount not to exceed $5,000.

Section 4.3    Project Site Clearing.  As, and to the extent, directed by the Company, the Authority shall use its best efforts to, at no expense of the Company, rough clear the Project Site of timber and subsequently "grub" (stump removal), and burn the timber-cleared areas, but shall leave a natural vegetative buffer. The Authority is not responsible for grading the Project Site, and/or filling any depressions or otherwise adjusting existing topographic and/or geological features on the Project Site.

Section 4.4    Road Improvements and Curb Cuts.  The Authorities shall cause, on a timely basis consistent with the Project Schedule, the road improvements and curb cuts described on Exhibit E to be designed, permitted, provided, constructed, and installed ("Road Infrastructure"), without cost or charge to the Company. The City shall to cause the Road Infrastructure to be constructed and installed in accordance with applicable law and regulations, and in accordance with plans approved in writing by the Company, which approval shall not be unreasonably withheld, conditioned, or delayed.

Section 4.5    Sink Holes. To the extent, and only to the extent, "sink holes" (rather than depression, voids, or other similar geologic conditions that are not sink holes) exist on the Project Site and directly impact the construction of Project Improvements, then the Authority shall, at its sole cost, conduct reasonable remedial action to alleviate the actual, direct, material impact to the construction of the Project Improvements. The Parties acknowledge and agree that the foregoing remediation obligation is intended to include all remedial actions necessary to cause the soils or geologic conditions impacted by any sink holes on which Project Improvements are to be located to be reasonably equivalent to the surrounding soils or geologic conditions that are not impacted by sink holes; *i.e.*, the soils in the sink hole impacted areas will support the Project Improvements in the same manner as the soils in non-impacted areas. At the Company's written request to the Authority, and subject to the Authority's reasonable written approval, a contractor selected and engaged by the Company shall perform the aforesaid remediation work in accordance with a scope and guaranteed maximum price approved by the Authority in writing (which approval shall not be unreasonably withheld, conditioned, or delayed), and the Authority shall pay the actual fees, costs and expenses of such work either directly to the Company's contractor or as a reimbursement to the Company within 30 days after delivery of a reasonably detailed invoice therefor.

## ARTICLE V

## CONSTRUCTION AND FINANCING OF THE PROJECT IMPROVEMENTS

Section 5.1    [Reserved]

Section 5.2    Project Improvements and Bond.

(a)    The Company shall pay the actual, third-party costs (including the cost of any materials purchased by the Company from third parties) for the design, construction, and installation of the Project Improvements.

(b)    The Authority shall, at the option of the Company, issue a taxable revenue bond in an amount not to exceed $300,000,000, in one or more series ("Bond"), payable only from the rental of the Project Site, the furniture, equipment and machinery installed by the Company at the Project or used in connection therewith (except any portion the Company elects to own directly) ("Leased Equipment") and Project Improvements (collectively, "Leased Real Property"), pursuant to a lease agreement to be entered into simultaneously with the issuance of the Bond ("Rental Agreement"). The rental due under the Rental Agreement shall be equal to the amount of required debt service on the Bond, which Bond shall be issued in accordance with such terms as the Company may determine to pay the costs of the Leased Property not paid from the Company's funds or the other sources described in this Agreement. The term of the Rental Agreement shall be not more than the term of the Bond. The Rental Agreement shall be a triple net lease and shall otherwise be reasonably acceptable to the Company. The Company shall have the option under the Rental Agreement, or under a separate option agreement, to purchase the Leased Property from the Authority, at any time prior to the maturity date of the Bond, for $10.00. The transfer of the Leased Property from the Authority to the Company shall be by quit claim deed and/or bill of sale, as appropriate, and shall be subject only to Permitted Encumbrances. The Company shall have the further option to purchase the Leased Property under the Rental Agreement, at any time the Bond is subject to optional redemption, at a purchase price equal to the principal amount of the Bond then outstanding, plus redemption premium, if any, plus accrued and unpaid interest thereon to the date set for redemption of the Bond, which redemption date shall be not later than 60 days after written notice of the exercise of such option is provided by the Company to the Authority. The terms and provisions of the Rental Agreement and the other related documents to be executed and delivered in connection with the Bond (collectively, "Bond Documents") will be mutually satisfactory to the Authority and the Company but will generally follow the forms of such documents used for similar transactions.

The Bond Documents will provide that in the performance of the covenants contained therein on the part of the Authority, any obligations it may incur for the payment of money will not be a general

obligation on its part, or on the part of the State or any other political subdivision or municipality, but will be a special or limited obligation payable solely from the specific payments received under the Rental Agreement or from bond proceeds, foreclosure proceeds, insurance proceeds, condemnation awards or other proceeds collected under the Rental Agreement or from security for the Company's obligations under the Rental Agreement or from security otherwise pledged under the Bond Documents.

The Company or an Affiliate will purchase the Bond or, subject to the approval of the Authority, determine an alternate purchaser. B. Thomas Conger, Esq. shall serve as the Authority's corporate counsel. King Kozlarek Law LLC shall serve as Bond Counsel to the Authority and shall be responsible for closing the Bond transaction. [_____] shall serve as corporate counsel to the County, the District, the Commissioner, and the Tax Assessor.  At the time of issuance of the Bond, the Company shall remit an amount to Bond Counsel to be determined by separate written agreement, which amount will be inclusive of reasonable costs associated with the Bond issue, which shall cover all costs and fees of Bond Counsel the Authority's corporate counsel, and the other Public Authorities' counsel for issuance costs and fees. Balch & Bingham LLP is serving as counsel to the Company and shall be paid by the Company pursuant to the Company's normal and customary arrangement with its counsel. The Rental Agreement and other Bond Documents will provide that the Company may purchase the Leased Property (as the same shall exist at the time of such purchase, subject to Permitted Encumbrances) at its option upon the terms and conditions as set forth therein for the sum of Ten U.S. Dollars ($10.00), upon the payment of the outstanding balance of the Bond, and the Authority will sell, and the Company will purchase, the Leased Property for the sum of Ten U.S. Dollars ($10.00) upon the payment in full of the outstanding balance of the Bond.

The Company will be permitted to obtain credit, debt, lease, or other lease financing from any source, related or unrelated to the Company in connection with the Project ("Additional Financing"); provided, however, in no event shall the Authority have any obligation or liability with respect thereto other than as set forth in this Section 5.2(b). The Rental Agreement will provide that, at the Company's election, the Rental Agreement, the Bond, and the other Bond Documents will be subordinated to any Additional Financing and any mortgage, security agreement, deed to secure debt, assignment of lease or other security instrument relating to the Project securing any Additional Financing. The Bond Documents will specifically provide that, in connection with any Additional Financing, the Authority will do all things necessary and execute all documents requested by the Company and/or its lender(s) to encumber the Leased Property, at the direction of the Company, to secure any Additional Financing, provided, however, that the Authority shall incur no pecuniary liability in connection therewith.

The Parties agree that the Bond will not be subject to the audit requirements of O.C.G.A. § 36-82-100 and that notice thereof will be included in the notice to the public in connection with the Bond validation proceeding.

The Company shall remit an amount to the Issuer to be determined by separate written agreement ("Bond Fee"), which amount will be inclusive of reasonable costs associated with the Bond issue, which shall cover all costs and fees of the Issuer.

**ARTICLE VI**

**[RESERVED]**

**ARTICLE VII**
**INFRASTRUCTURE**

Section 7.1    Water.

The City shall, on a timely basis consistent with the Project Schedule as set forth on Exhibit D ("Project Schedule"), design, permit, provide, construct and install domestic, potable water supply and

related infrastructure to be designed, permitted, constructed, and installed ("New Water Infrastructure") to convey treated, potable/domestic water from the public, potable water facilities owned and operated by the City to a mutually agreeable point of service on the Project Site (which the parties anticipate being adjacent to one of the buildings making up the Project Improvements), without cost or charge to the Company, provided, however, under no circumstances shall the City be responsible for operation or maintenance of any utility infrastructure located on the Project Site and the City shall not accept any easement regarding the same.

The City represents and warrants to the Company that it either has secured as of the Effective Date, or will secure as soon as reasonably practical after the Effective Date, all necessary Permits and easements and other rights and privileges to construct the New Water Infrastructure, and any improvements or upgrades to the City's offsite process water facilities and City's offsite potable water facilities, if any, required to provide the Project Site with process and potable water as contemplated hereby. The City shall begin the construction and installation of the New Water Infrastructure as soon as reasonably practicable after the Effective Date, and shall complete the New Water Infrastructure, consistent with the Company's timetable for completion of Site Construction, all in accordance with the Project Schedule.

At some time in the future if Company desires, it may install its own water wells.

Section 7.2    Wastewater.

The City shall, on a timely basis consistent with the Project Schedule and at no cost or charge to the Company, design, permit, construct, and install wastewater and sanitary sewer receiving line(s) and related infrastructure to be designed, permitted, constructed, and installed ("New Wastewater Infrastructure") to convey wastewater and sanitary sewer-related materials, to a mutually agreeable point of service on the Project Site (which the parties anticipate being adjacent to one of the buildings making up the Project Improvements), so that the New Wastewater Infrastructure will connect the improvements at Project Site to the offsite wastewater/sanitary sewer facilities owned and operated by the City, provided, however, under no circumstances shall the City be responsible for operation or maintenance of any utility infrastructure located on the Project Site and the City shall not accept any easement regarding the same.

The City shall construct and install the New Wastewater Infrastructure in accordance with applicable law and regulations, and in accordance with plans approved in writing by the Company, which approval shall not be unreasonably withheld, conditioned, or delayed provided they evidence a design to satisfy the requirements set forth in Exhibit D. For its wastewater/sanitary sewer service, the City shall not charge the Company more than the City's standard rates and charges (for similar users with comparable facilities) in effect from time to time.

The City represents and warrants to the Company that it either has secured as of the Effective Date, or will secure as soon as reasonably practical after the Effective Date, all necessary Permits and easements and other rights and privileges to construct the New Wastewater Infrastructure, and any improvements or upgrades to the City's offsite wastewater facilities, if any, required to process the wastewater generated by the Project as contemplated hereby. The City shall begin the construction and installation of the New Wastewater Infrastructure as soon as reasonably practicable after the Effective Date, and shall complete the New Wastewater Infrastructure, consistent with the Company's timetable for completion of Site Construction, all in accordance with the Project Schedule.

Section 7.3    Natural Gas.

The City shall cause, on a timely basis consistent with the Project Schedule, natural gas lines and related infrastructure to be designed, permitted, provided, constructed, and installed ("New Natural Gas Infrastructure"), without cost or charge to the Company, to a mutually agreeable point of service on the Project Site (which the parties anticipate being adjacent to one of the buildings making up the Project Improvements), so that the New Natural Gas Infrastructure will connect the improvements at Project Site to the offsite natural gas facilities owned and operated by the City, provided, however, under no

circumstances shall the City be responsible for operation or maintenance of any utility infrastructure located on the Project Site and the City shall not accept any easement regarding the same.

The City shall construct and install the New Gas Infrastructure in accordance with applicable law and regulations, and in accordance with plans approved in writing by the Company, which approval shall not be unreasonably withheld, conditioned, or delayed provided they evidence a design to satisfy the natural gas requirements set forth in Exhibit D. For natural gas supply, the City agrees to charge the Company no more than the City's standard rates and charges (for similar users with comparable facilities) in effect from time to time. The Company's natural gas requirements are set forth on Exhibit D.

The City represents and warrants to the Company that it either has secured as of the Effective Date, or will secure as soon as reasonably practical after the Effective Date, all necessary Permits and easements and other rights and privileges to construct and install the New Natural Gas Infrastructure and any improvements or upgrades to the City's offsite natural gas facilities, if any, required to provide the Project Site with natural gas service as contemplated hereby. The City shall begin the construction and installation of the New Natural Gas Infrastructure as soon as reasonably practicable after the Effective Date, and complete the New Natural Gas Infrastructure, all in accordance with the Company's timetable for completion of Site Construction, as set forth in the Project Schedule.

Section 7.4    Electricity. The City shall use its reasonable best efforts to cause electric service and electric infrastructure to be provided to the Project Site, or as may otherwise be mutually agreed upon, and on a timely basis consistent with the Project Schedule. The Company's electricity requirements are set forth on Exhibit D. The Company acknowledges that the Company's designated electricity provider, not the City, will be the electric provider to the Project Site, and the City has various limitations regarding direct provision of electric service and electric infrastructure.

Section 7.5    Telecommunications.

The City shall, at the request of Company, cause, on a timely basis consistent with the Project Schedule and without charge or cost to the Company, fiber telecommunications lines for internet connectivity to be designed, permitted, provided and installed to a mutually agreeable point of service on the Project Site (which the parties anticipate being adjacent to one of the buildings making up the Project Improvements ("New Fiber Facilities"), which shall connect to the fiber network owned and operated by the City, provided, however, under no circumstances shall the City be responsible for operation or maintenance of any utility infrastructure located on the Project Site and the City shall not accept any easement regarding the same. The Authority understands the New Fiber Facilities, together with the City's existing fiber network, have sufficient capacity to service the Company's requirements to service the Company's operational needs.

The City shall construct and install the New Fiber Facilities in accordance with applicable law and regulations, and in accordance with plans approved in writing by the Company, which approval shall not be unreasonably withheld, conditioned, or delayed provided they evidence a design to satisfy the internet/data requirements set forth in Exhibit D. For fiber telecommunications lines for internet connectivity, the City agrees to charge the Company no more than the City's standard rates and charges (for similar users with comparable facilities) in effect from time to time. The Company's fiber telecommunications for internet connectivity requirements are set forth on Exhibit D.

The City shall use its reasonable best efforts to cause telephone service to be provided to the Project Site, or as may otherwise be mutually agreed upon, without cost or charge to the Company and on a timely basis consistent with the Project Schedule. The Company's telephone requirements are set forth on Exhibit D. The Company acknowledges that AT&T, not the City, is the telephone provider to the Project Site, and the City has various limitations regarding direct provision of telephone service and telephone infrastructure.

The City represents and warrants to the Company that it either has secured as of the Effective Date, or will secure as soon as reasonably practical after the Effective Date, all necessary Permits and easements

- 13 -

and other rights and privileges to construct and install the New Fiber Facilities and any improvements or upgrades to the City's existing fiber network, if any, required to provide the Project Site with data services as contemplated hereby. The City shall begin the construction and installation of the New Fiber Facilities as soon as reasonably practicable after the Effective Date, and complete the New Fiber Facilities, all in accordance with the Company's timetable for completion of Site Construction, as set forth in the Project Schedule.

Section 7.6    City Failure to Timely Perform. Subject to extensions of the applicable deadline resulting from Force Majeure, if the City fails to timely complete any of the utility or road infrastructure to be completed by the City under Article IV or VII, and the City's failure is not cured within 30 days after the Company delivers notice to the City of such failure, then the Company shall have the right, but not the obligation, to perform any incomplete work on the City's behalf and at the City's expense ("Self-Help Right"). The City shall reimburse the Company for any actual and reasonable fees, costs, and expenses incurred by the Company in connection with exercising the Self-Help Right within 30 days after the Company's delivery to the City of a reasonably detailed invoice therefor. The City hereby grants the Company any necessary rights of entry, licenses, and easements necessary to access and enter any lands owned by the City (or in which the City has rights) in or through which the Company reasonably requires access to exercise the Self-Help Right.

## ARTICLE VIII

## TAX INCENTIVES

Section 8.1    Job Tax Credits; Tax Exemptions. Based solely on the 2023 Job Tax Credit Tiers Map published by the Georgia Department of Community Affairs ("DCA") and the designation by DCA that the project lies in a Less Developed Census Tract, the Public Authorities represent and warrant that the County has been designated as a "Tier 2" county for the purposes of the State job tax credits described in O.C.G.A. § 48-7-40 ("JCT Act") but the project lies in an area statistically similar to a Tier 1 County, and therefore the Company may be entitled to Three Thousand Five Hundred Dollars ($3,500.00)/job tax credit under the JCT Act. The Public Authorities will provide the Company such further certifications and information as are reasonably required by the Company to claim any other State tax credits or tax exemptions to which the Company may be entitled. If the Public Authorities receive notice that the State (or any department or agency of the State, including, without limitation, DCA) intends, or has determined, to increase the applicable Tier designation of the County under the JCT Act, the Public Authorities shall promptly notify the Company and reasonably cooperate and coordinate with the Company in efforts to prevent (or reverse, as applicable) the increase in the Tier designation of the County to the extent such increase would reduce the benefits available to the Company under the JCT Act.

Section 8.2    Local Freeport Exemption. Pursuant to O.C.G.A. § 48-5-48.2, the Public Authorities represent and warrant that the City and the County have adopted a Level 1 100% Freeport Tax Exemption with respect to the classes of inventory set out in O.C.G.A. § 48-5-48.2 ("Freeport Exemption"). Neither the City nor the County have the present intention, nor do they, as of the execution and delivery of this Agreement, foresee a circumstance under which the City or the County would intend, to take any action, or fail to take any action, which would cause the Freeport Exemption to expire, terminate, be canceled, or otherwise unavailable to the Company. The Public Authorities acknowledge the existence, continuation and availability of the Freeport Exemption is a material inducement to the Company's decision to locate the Project on the Project Site.

The provisions of this Agreement relative to the assessment and taxability of the Project for Freeport Exemption purposes are the obligation and responsibility of the Tax Commissioner and the Board of Tax Assessors.  The Tax Commissioner and the Board of Tax Assessors acknowledge and agree that (i) this Agreement is consistent with applicable requirements for qualification under the Freeport Exemption, (ii) for taxation purposes, the inventory of the Company in the Project, which will include but is not limited to non-human primates that are housed in the Company's facilities, where they are fed, conditioned,

provided enrichment, and otherwise cared for over an extended period until they attain a size and weight where they are suitable for sale to researchers, are "tangible personal property" and "Inventory of goods in the process of manufacture or production" as described in O.C.G.A. § 48-5-48.2(c)(1) and contemplated in this Agreement, and (iii) that the inventory of the Company in the Project as so classified shall at all times be subject to the Freeport Exemption from taxation. The other Public Authorities agree to such provisions and agree that the Board of Tax Assessors shall comply with the foregoing.

Despite the Public Authorities' agreement that the inventory of the Company in the Project shall at all times be subject to the Freeport Exemption, the Company shall, for administrative purposes, still file an Application for Freeport Inventory Exemption ("Freeport Application") on or before April 1 of each calendar year, using the Freeport Application form made publicly available by the Tax Commissioner and/or Tax Assessor.

Section 8.3    [Intentionally Omitted].

Property Tax Adjustment. The Parties intend and agree that the interests of the Company in the Project may be arranged to constitute a usufruct or bailment for hire and not a leasehold estate or estate for years and, therefore, will not be subject to ad valorem taxation. However, to support the Authority and the local community, the Company agrees that the Company will, subject to the terms of this Agreement and related agreements, pay to the Tax Commissioner in each year during the term of the Rental Agreement, as a payment in lieu of taxes, an amount equal to the applicable percentage of ad valorem taxes which would otherwise be due in such year to all relevant taxing authorities ("Taxing Authorities") on the Project under the Rental Agreement and the PILOT Agreement as if title to such Project were held by the Company instead of the Authority, as such payment percentages are set out in Exhibit H. For all tax years following termination of the Rental Agreement, the Project which was subject to the Rental Agreement will be subject to ordinary ad valorem taxation.

The Tax Commissioner shall distribute the amounts received from the Company as payments in lieu of taxes to the Taxing Authorities as if such amounts were property taxes. In the event that for any reason it is determined that the interest of the Company is not a usufruct or bailment for hire, then the Public Authorities shall value of the Company's interest in the Project during the term of the Rental Agreement treated in a manner such that property taxes owed by the Company with respect to such Project will be commensurate with and equal to the payments in lieu of tax required above on such Project, and for the Company to receive a credit against its obligation to make payments in lieu of tax hereunder or under the Bond Documents in an amount equal to actual property taxes paid.

Each year during the term of the Rental Agreement, the Company will submit property tax returns on forms PT 50 and PT 50R (or such other forms as may be prescribed by State law), at the times required by State law. Such returns shall indicate those assets which are Leased Equipment and those which are owned in fee by the Company.

Section 8.4    Change in Law. As of the Effective Date and pursuant to the terms of this Agreement, the Public Authorities represent and warrant that the Company is eligible for the tax incentives described in Section 8.4. The Public Authorities acknowledge and agree that some of the rights and privileges granted to the Company in Section 8.4 will vest upon the occurrence of future events after the Effective Date. Therefore, in the unlikely and unanticipated event of a change in law after the Effective Date that is effective for any period during the term of the Rental Agreement, the result of which would be to lessen or remove from the Company the economic benefit of the tax incentives in Section 8.4 that would have been available during such period under the law in effect on the Effective Date, the Public Authorities shall, to the extent permitted by law, provide the Company with an exemption from the law as so changed or another incentive having equivalent economic effect to the tax incentive so lessened or removed.

## ARTICLE IX

## LOCAL INCENTIVES

Section 9.1    Assistance with Employment Incentive Programs. The Public Authorities shall use highest and best efforts to assist the Company in obtaining the maximum employee training services program and related benefits available to manufacturing projects like the Project in the State from any available training agency providing such services, programs, and benefits. The Public Authorities shall cooperate with appropriate agencies to provide facilities and resources necessary for employee training. These services shall include QuickStart training and recruitment and advertising support. In addition to the incentives referenced in Article X, the Public Authorities will also work with legislative leaders and Cornerstone Government Affairs (the Authority's lobbying firm) in an effort to grant additional tax incentives for the benefit of the Project, including, without limitation, port tax credits and sales tax waivers.

Section 9.2    Zoning Changes. Notwithstanding anything in the PSA to the contrary, prior to Closing (as defined in the PSA), the Public Authorities shall cause all or any portion of the Project Site, as identified by the Company, to be re-zoned to permit a use consistent with the Project.

## ARTICLE X

## STATE INCENTIVES

Section 10.1    Reserved

Section 10.2    Other State Incentives. As a further inducement for the Company's location of the Project in the State, the State has offered various inducements as outlined on Exhibit G. Such incentives are the responsibility of the State and are included here for reference purposes. The Public Authorities agree to enter into all reasonable agreements and to otherwise use the Public Authorities' reasonable best efforts to secure and make available such State incentives to the Company.

## ARTICLE XI

Section 11.1    Reserved.

## ARTICLE XII

## MISCELLANEOUS

Section 12.1    Authorization. The Public Authorities represent that they each have the legal power and authority to enter into this Agreement, and any ancillary agreement attached hereto as an exhibit to which the Public Authorities are a party, and to make the respective commitments made herein, or therein, and this Agreement has been approved by all necessary action of the governing body of the Public Authorities, and to the extent that the Public Authorities require the authorization, approval or consent of any public body or third party for the Public Authorities to have made the commitments contained in this Agreement, or any ancillary agreement attached hereto as an exhibit to which the Public Authorities are a party, that such authorizations, approvals and consents have been duly obtained in accordance with applicable law and procedures.

Section 12.2    Contingencies. Notwithstanding anything in this Agreement to the contrary, all of the Parties' rights, obligations and liabilities under this Agreement are subject to the satisfaction of the following contingencies (collectively, "Contingencies"): (1) confirmation from the State, in a form and manner satisfactory to the Company in its sole and absolute discretion, that the Company will receive certain State Incentives listed in Exhibit G, and (2) the Company's closing on the acquisition of the fee

simple interest in any portion of the Project Site under the terms of the PSA, and (3) a final judgment issued by the Superior Court of Decatur County confirming and validating the Bond, this Agreement, the PILOT Agreement and the security therefor, and the expiration of all opportunities to appeal such judgment, and (4) the issuance and delivery of the Bond and the execution and delivery of the Bond Documents. If the Contingencies are not satisfied (or waived in writing by all of the Parties) on or before February 29, 2024, then notwithstanding anything herein to the contrary: (i) this Agreement shall automatically terminate, be null and void, and none of the Parties shall have any further rights, obligations or liabilities to the other Parties hereunder, and (ii) each Party shall be responsible for paying all of the fees, costs and expenses of its counsel(s), consultants and contractors.

Section 12.3    Intellectual Property. All rights in Intellectual Property conceived of or created during the term of this Agreement and related to the Project shall be the property of the Company. Upon request of the Company made to the Public Authorities identifying the Intellectual Property conceived or created, and at the Company's expense, the Public Authorities shall (i) cause a disclosure document to be executed and delivered to the Company reporting such Intellectual Property, which document shall be subject to all provisions of State law; and (ii) execute such writings as the Company may reasonably request to vest good ownership of the Intellectual Property in the Company.

Section 12.4    Reserved.

Section 12.5    Governing Law. The governing law of this Agreement shall be the law of the State of Georgia.

Section 12.6    Severability. In case any one or more of the provisions contained in this Agreement should be invalid, illegal, or unenforceable in any respect and for any reason whatsoever, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. In the event any such provision is held to be invalid, illegal, or unenforceable, the Parties hereto shall make their best efforts to agree on a provision in substitution for such invalid, illegal or unenforceable provision that is as near in economic benefit as possible to the provision found to be invalid, illegal, or unenforceable.

Section 12.7    Notices. Any notice, request, demand, claim or other communication hereunder shall be in writing and shall be duly given or made (i) when received by U.S. mail; (ii) when personally delivered to the intended recipient (or an officer of the intended recipient); (iii) when sent by certified first-class mail, return receipt requested, postage prepaid; (iv) when sent by recognized overnight courier service; or (v) when sent by electronic mail to the following addresses and recipients:

COMPANY:                        Safer Human Medicine, Inc.
                                21 Sheldon Road
                                Cohasset, Massachusetts 02025
                                Attention: David Johst, President and General Counsel
                                Email: dave.johst@saferhm.com

                                with concurrent copies to:

                                Savills Inc.
                                1252 Ingerson Road
                                Arden Hills, Minnesota 55112
                                Attn: Ms. Ann Marie Collins
                                Email: ACollins@savills.us

                                and

                                Walter E. Jones, Esq.
                                Balch & Bingham LLP
                                30 Ivan Allen, Jr. Boulevard NW

Suite 700
Atlanta, Georgia 30308
Telephone: 404.962.3540
Email:  wjones@balch.com

AUTHORITY:            Decatur County-Bainbridge Industrial Development Authority
                      P.O. Box 755
                      Bainbridge, Georgia 39818
                      Telephone: 229.246.4774
                      Attention: Executive Director
                      Email: rm@bainbridgedecaturga.com

                      with concurrent copies to (do not constitute notice):

                      Conger & Smith Attorneys At Law, LLC
                      218 E. Water Street
                      Bainbridge, Georgia 39817
                      Attention: B. Thomas Conger, Esq.
                      Email: tomconger@bellsout.net

                      King Kozlarek Law LLC
                      Attention: Michael E. Kozlarek, Esq.
                      Email: michael@kingkozlarek.com
                      Post Office Box 565
                      Greenville, South Carolina 29602-0565
                      Telephone: 803.312.3199

COUNTY:               Decatur County, Georgia
                      P. O. Box 726
                      Bainbridge, Georgia 39818
                      Telephone: 229-248-3030
                      Facsimile: 229-246-2062
                      Attention: Alan Thomas, County Administrator
                      Email: athomas@decaturcountyga.gov

         with concurrent copies to (does not constitute notice):

                      Bruce W. Kirbo, Jr. Esquire
                      Kirbo & Heckman Attorneys at Law LLC
                      206 West Water Street
                      Bainbridge, Georgia 39817
                      Email: bkirbo@kirbolawyers.com
CITY:                 City of Bainbridge, Georgia
                      P. O. Box 158
                      Bainbridge, Georgia 39818
                      Telephone: 229-248-2005
                      Facsimile: 229-246-7311
                      Attention: Chris Hobby, City Manager
                      Email: chrish@bainbridgecity.com

         with concurrent copies to (does not constitute notice):
                      Thomas B. Conger. Esquire
                      Conger & Smith Attorneys at Law LLC
                      218 East Water Street
                      Bainbridge, Georgia 39817

- 18 -

Email: tomconger@bellsouth.net

|                     |                                                           |
|---------------------|-----------------------------------------------------------|
| DISTRICT:           | Decatur County School District                           |
|                     | 100 South West Street                                     |
|                     | Bainbridge, Georgia 39817                                 |
|                     | Telephone: 229-248-2200                                   |
|                     | Attention: Tim Cochran, Superintendent of Schools        |
|                     | Email: tcochran@dcboe.com                                 |
| TAX ASSESSORS:      | Decatur County Board of Tax Assessors                    |
|                     | P. O. Box 1106                                            |
|                     | Bainbridge, Georgia 39818                                 |
|                     | Telephone: 229-248-3008                                   |
|                     | Facsimile: 229-248-3053                                   |
|                     | Attention: Amy Rathel, Chief Appraiser                   |
|                     | Email: amy@decaturcountyga.gov                           |
| TAX COMMISSIONER:   | Decatur County Tax Commissioner                          |
|                     | P.O. Box 246                                              |
|                     | Bainbridge, Georgia 39818                                 |
|                     | Telephone: 229-248-3021                                   |
|                     | Facsimile: 229-248-3747                                   |
|                     | mharrell@decaturcountyga.gov                             |

or to such other address as the receiving Party shall have most recently forwarded to the sending Party pursuant to the provisions of this Section 11.7.

Section 12.8    Publicity and Trade Secrets. The Public Authorities understand, subject to the Georgia Open Records Act, O.C.G.A. § 50-18-70 *et seq*., as amended ("Georgia Open Records Act"), the importance to the Company and the goodwill of the Project to keep matters strictly confidential until any such matter is publicized by the Company or with the prior written consent of the Company. The Company recognizes and agrees that this Agreement, when executed, becomes a public record of the State open to inspection and copying by the public. Further, the Company agrees that the fact of this Agreement and any vote of a board or authorizing body of the Public Authorities authorizing or approving the execution of this Agreement must be made in a public meeting of the Public Authorities. To the fullest extent permitted by law (including the Georgia Open Records Act, the Georgia Open Meetings Act, O.C.G.A. § 50-14-1 *et seq*., as amended ("Georgia Open Meetings Law"), and the Georgia Trade Secrets Act of 1990, O.C.G.A. § 10-1-760 *et seq*., as amended), the Public Authorities agree to not disclose the trade secrets of the Company. In the event the Public Authorities are requested to disclose any such information pursuant to a request under any laws (including the Georgia Open Records Act and the Georgia Open Meetings Law), then the Public Authorities will provide the Company with prompt notice, reasonable under the circumstances, so that the Company may seek a protective order or other appropriate remedy to protect this confidential information.

Section 12.9    Assignment. This Agreement is not assignable without the written consent of all Parties, except that the Company shall have the right at any time to assign all, but not less than all, its rights, interests, and obligations in and to the Project, the Project Site, and this Agreement to any party to whom the Rental Agreement may be assigned by the Company; provided that such party agrees to assume the assigned obligations of the Company in and to the Project, the Project Site, and this Agreement (or if the assignment is by operation of law (*e.g.*, a merger), such assumption is effected by operation of law); and except that the Public Authorities may assign their rights and obligations solely with respect to issuing the Bond, owning the Project and entering into the other related arrangements to another public authority of the State which is authorized to issue such bonds and enter into such agreements (and provided that any such assignment or transfer does not adversely affect any of the Company's rights under this Agreement or the Bond Documents).

Section 12.10    Further Assurances. At the sole expense of the Company, the Public Authorities agree to do all things reasonably necessary and prudent and take all actions reasonably necessary and prudent as may be appropriate related to this Agreement after the Effective Date to establish the Project during Site Construction and on an ongoing basis, thereafter, including without limitation the obtaining, negotiation, execution, and delivery of all necessary or desirable agreements, filings, consents, authorizations, approvals, licenses, or deeds.

Section 12.11    Specific Performance and Damages.

(a)      Each of the Parties hereto acknowledges and agrees that the Company would be damaged irreparably in the event that any of the provisions of this Agreement are not materially performed by the Public Authorities in accordance with their specific terms or otherwise are materially breached. Accordingly, the Public Authorities agree that the Company shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and, to the extent permitted by law, to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court located in the State having appropriate personal jurisdiction over the Public Authorities and the matter, in addition to any other remedy to which the Company may be entitled, at law or in equity. Nothing contained herein shall be construed to waive sovereign immunity under State law related to the Public Authorities. The Company rights and remedies under this Agreement shall not be limited to injunctive relief and specific performance, and, subject to the previous sentence and subsection (b) below, the Company shall have all rights and remedies available to it at law or in equity in connection with any breach or default by the Public Authorities of their obligations under this Agreement.

(b)      Except as otherwise provided herein, no Party shall, in any event, be liable to any other Party, whether by way of indemnity or otherwise, for any indirect, incidental, punitive, special, or consequential damages, including loss of revenue or profit, cost of capital, loss of business reputation or opportunity costs due to delays in payment, whether any such damages arise out of contract, tort (including negligence), strict liability or otherwise.

Section 12.12    Conflicts. If any provision in this Agreement conflicts or is inconsistent with any ancillary agreements relating to the Project as entered into previously between the Company and the Authority, then the terms, conditions, and obligations contained in this Agreement shall control.

Section 12.13    Survival of Representations. The covenants and representations made by each of the Parties hereto and contained herein shall survive the performance of any obligations to which such covenants and representations relate.

Section 12.14    Term of Agreement. The term of this Agreement shall commence on the Effective Date and continue in effect through the expiration or earlier termination of the PILOT Agreement.

Section 12.15    No Third-Party Beneficiaries. Other than as set forth in this Agreement, this Agreement shall not confer any rights or remedies upon any person other than the Parties hereto and their respective successors or permitted assigns.

Section 12.16    Article and Section Titles and Headings. The article and section titles and headings are for convenience only and do not define, modify, or limit any of the terms and provisions hereof.

Section 12.17    Incorporation of Exhibits, Annexes and Schedules. The exhibits, annexes and schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

Section 12.18    Entire Agreement. This Agreement (including the agreements and exhibits referred to herein) constitutes the entire agreement among the Parties hereto and supersedes any prior understandings, agreements, or representations by or among the Parties hereto, whether written or oral.

Section 12.19    Amendments and Waivers. No amendment of any provision of this Agreement

shall be valid unless the same shall be in writing and duly signed by an authorized representative of each of the Parties hereto. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

Section 12.20    Cost and Expense. Except as otherwise specifically set forth herein, each Party hereto agrees to pay its own costs incurred in connection with the Project proposal, including legal fees and all costs and expenses incurred in connection with the preparation of any studies or reports, surveys or approvals, this Agreement or otherwise. The Company shall be responsible for all reasonable transactional costs of the issuance of the Bond and other matters related thereto, including, without limitation: (i) all reasonable legal fees and disbursements of Bond Counsel related to the issuance of the Bond and the preparation and distribution of this Agreement and of transcripts (as described below); (ii) the reasonable fees and disbursements of the Authority's counsel related to closing of the issuance of the Bond (as described below); (iii) the court costs relating to validation of the Bond and recording and filing fees; and (iv) the Authority's financing fee for the issuance of the Bond. The Company shall also be responsible for the fees and disbursements of counsel to the Company.

Section 12.21    Construction. The construction of this Agreement shall be in accordance with State law. Should any term or provision of this Agreement violate State law, such term or provision shall be deemed null and void. In this Agreement, unless State law or the context indicates otherwise, the singular includes the plural and the plural the singular; references to statutes, sections or regulations are to be construed as including all statutory or regulatory provisions consolidating, amending, replacing, succeeding or supplementing the statute, section or regulation referred to; references to "writing" includes typing and other means of reproducing words in a tangible visible form; the words "including," "includes" and "include" shall be deemed to be followed by the words "without limitation" or "but not limited to" or words of similar import; references to articles, sections (or subdivisions of sections), exhibits, appendices, annexes or schedules are to those of this Agreement unless otherwise indicated; references to agreements and other contractual instruments shall be deemed to include all exhibits, schedules and appendices attached thereto; references to days shall mean calendar days unless otherwise specified. The Parties hereto intend that each representation and covenant contained herein shall have independent significance. Capitalized terms utilized herein shall have the meaning ascribed thereto in Article I hereof, unless the meanings of such terms have been otherwise specified in a different context.

Section 12.22    Binding Effect. This Agreement and all terms, provisions and obligations set forth herein shall be binding upon and shall inure to the benefit of the Company and its successors and assigns and shall be binding upon and shall inure to the benefit of the Public Authorities, and the Public Authorities and any other agencies, departments, divisions, governmental entities, public corporations and other entities which shall be successors to the Public Authorities or which shall succeed to or become obligated to perform or become bound by any of the covenants, agreements or obligations hereunder of any of the Public Authorities. In addition, the Parties agree (i) to take all actions, without exception, which may be legally taken, and which are necessary and appropriate at any time to assure the binding effect, legality, and enforceability of their respective obligations hereunder and (ii) not to take any action which would affect adversely in any way whatsoever the binding effect, legality, and enforceability of their respective obligations hereunder.

Section 12.23    Counterparts. This Agreement may be executed simultaneously in multiple counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

Section 12.24    No Personal Liability of Representatives of the Authority. No official, member, director, officer, agent, or employee of the Public Authorities shall have any personal liability under or relating to this Agreement. Rather, the agreements, undertakings, representations, and warranties contained herein are and shall be construed only as corporate agreements, undertakings, representations, and warranties, as appropriate, of the Public Authorities. Without limitation, and without implication to the

- 21 -

contrary, all Parties hereto waive and release any and all claims against each such official, member, director, officer, agent, or employee personally, under or relating to this Agreement, in consideration of the entry of the Public Authorities into this Agreement.

Section 12.25    No Personal Liability of Representatives of Company. No official, member, director, officer, agent, or employee of the Company shall have any personal liability under or relating to this Agreement. Rather, the agreements, undertakings, representations, and warranties contained herein are and shall be construed only as corporate agreements, undertakings, representations, and warranties, as appropriate, of the Company. Without limitation, and without implication to the contrary, all Parties hereto waive and release any and all claims against each such official, member, director, officer, agent, or employee personally, under or relating to this Agreement, in consideration of the entry of the Company into this Agreement.

Section 12.26    Extension of Deadlines. The Public Authorities' performance of any obligation under this Agreement shall be extended on a day-for-day basis to the extent any performance of that the Public Authorities is delayed by Force Majeure. The Public Authorities shall deliver prompt written notice to the Company (after the Authority has notice of the same) of the event of Force Majeure.

**[ONE SIGNATURE PAGE AND SEVEN EXHIBITS FOLLOW]**
**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

**IN WITNESS WHEREOF**, the Parties have caused this Project Agreement to be executed in their respective names and their respective seals to be hereunto affixed and attested by their duly authorized officers, all as of the date first above written.

**SAFER HUMAN MEDICINE, INC.**

Signed, sealed, and delivered
in the presence of:

By: _____
Name: _Jim Harquess_
Title: _CEO_

_____
Unofficial Witness

[SEAL]

_____
Notary Public

Commission Expiration Date:

[NOTARY SEAL]

**DECATUR COUNTY-BAINBRIDGE
INDUSTRIAL DEVELOPMENT AUTHORITY**

Signed, sealed, and delivered
in the presence of:

By: _____
Name: _Keith Lyle_
Title: _Chairman_

_____
Unofficial Witness

[SEAL]

_____
Notary Public

Commission Expiration Date:

[NOTARY SEAL]

**DECATUR COUNTY SCHOOL DISTRICT**

Signed, sealed and delivered
in the presence of:

_____
Unofficial Witness

_____
Notary Public

Commission Expiration Date:

[NOTARY SEAL]

By: _____

Name: _Keith Lyle_

Title: _Chairman_

[SEAL]

**CITY OF BAINBRIDGE, GEORGIA**

Signed, sealed and delivered
in the presence of:

By: _____

Name: _Edward Reynolds_

Title: _Mayor_

_____
Unofficial Witness

[SEAL]

_____
Notary Public

Commission Expiration Date:

[NOTARY SEAL]

Allison R. Godwin
COMM. EXP.
NOTARY
Decatur County
PUBLIC
03-21-2027
State of GA

**DECATUR COUNTY TAX COMMISIONER**

By: _____

Name: Mark Harrell

Title: Tax Commissioner

Signed, sealed and delivered
in the presence of

_____
Unofficial Witness

[SEAL]

_____
Notary Public

Commission Expiration Date:

[NOTARY SEAL]

**DECATUR COUNTY**
**BOARD OF TAX ASSESSORS**

Signed, sealed and delivered
in the presence of:

_____
Unofficial Witness

_____
Notary Public

Commission Expiration Date:

[NOTARY SEAL]

By: _____

Name: _____

Title: _____

[SEAL]

**DECATUR COUNTY, GEORGIA**

Signed, sealed and delivered
in the presence of:

By: _____

Name: _____Pete Stephens_____

Title: _____Chairman_____

_____
Unofficial Witness

[SEAL]

_____
Notary Public

Commission Expiration Date:

[NOTARY SEAL]

**EXHIBIT A**
**PROJECT SITE**

**Lot 3, Parcel 00680010 (Portion), Downrange Industrial Park**

All that certain piece, parcel or lot of land with any improvements, thereon, situate, lying and being in the 15th Land District of Decatur County, Georgia, and being that certain 192.207 acre tract of land more particularly shown as Lot 3 on a plat for Downrange Industrial Park certified by Gene W. Webb, Georgia Registered Land Surveyor No. 2923, and being a portion of all that tract of land in Land Lots 298 and 327 of the 15th Land District of Decatur County, Georgia described as follows: The point of beginning is an iron pin at the intersection of the east right of way of Pondtown Road with the north land lot line of Land Lot 327. From said point of beginning run south 87 degrees 40 minutes 13 seconds east along the north land lot line a distance of 6,449.38 feet to a concrete monument on the west right of way of State Highway 253; run south 08 degrees 14 minutes 23 seconds west along said highway a distance of 295.154 feet; run thence in a southerly direction along the west right of way of said highway in a curve to the left having a chord bearing of south 04 degrees 14 minutes 27 seconds west a chord distance of 815.986 feet, and a length of 816.649 feet; run thence south 00 degrees 14 minutes 30 seconds west along the west right of way of said highway a distance of332.474 feet to fill iron pin; run thence north 89 degrees 36 minutes 59 seconds west a distance of 1,849.75 feet to an iron pin; run thence south 00 degrees 24 minutes 12 seconds west a distance of 535.34 feet to an iron pin; run thence north 87 degrees 36 minutes 44 seconds west a distance of 4,603.51 feet to an iron pin on the east right of way of Pondtown Road; run thence north 01 degree 56 minutes 21 seconds east along the east right of way of said road a 261.002 feet; run thence in a northerly direction along the east right of way of said road in a curve to the right having a chord bearing of north 02 degrees 44 minutes 31 seconds east, a chord distance of 394.798 feet and a length of 394.811 feet; nm thence north 03 degrees 32 minutes 42 seconds east along the east right of way of said road a distance of 1,379.10 feet to the iron pin at the point of beginning. Said property is all of Tract I containing 276.564 acres as shown on a plat of survey prepared by Larry W. Grogan dated September 17, 2018.

LESS AND EXCEPT THE FOLLOWING DESCRIBED PROPERTY: There is a 7.974 acre tract conveyed to Georgia Power Compm1y by deed recorded in Book 507, Page 487, Decatur Land Records, as shown on a plat of survey recorded in Plat Book Cl 25, Page 68, aforesaid records. EXCEPTED from the property described herein is all that part of said 7.974 acre tract lying within the above-described 276.564 acre Tract I.

Parcel No.: 00680010 (Portion)

Said tract or parcel containing approximately 192.207 acres.



PLAT OF SURVEY
DOWNRANGE INDUSTRIAL PARK

**EXHIBIT B**
**PERMITTED ENCUMBRANCES**

1.      Right of Way Deed to the State Highway Department of Georgia dated May 16, 1952, and recorded in Book B-6, Page 185, real property records of Decatur County, Georgia.

2.      Right of Way Deed to Decatur County, Georgia, dated July 17, 1996, and recorded in Book N-19, Page 125, aforesaid records.

3.      Easements to Georgia Power Company as follows: (a) dated May 27, 1998, and recorded in Book P-20, Page 513, and (b) dated August 18, 2022, and recorded in Book 503, Page 728, aforesaid records.

4.      [Any matter shown on the plat of survey referred to in the property description which is not objected to by Company prior to [the first day of the Initial Term of the Rental Agreement.]]

5.      All liens and encumbrances caused to come into being by the Company or consented to in writing by the Company.

**<u>EXHIBIT C</u>**
**PROJECT SCHEDULE**

**EXHIBIT D**
**UTILITY REQUIREMENTS**
**(APPLICABLE TO LOCAL GOVERNMENTAL ENTITIES)**

| Electricity | Daily Average load | Maximum Load (per hour only) |
|---|---|---|
| | kWh/day | kW/h |
| Jan-24 | | 0.25 |
| Sep-24 | | 0.35 |
| Oct-24 | | 1.00 |
| Jan-26 | | 3.00 |
| Jan-30 | | 7.00 |
| Jan-33 | | 10.0 |
| Dual access preferred; not required. | | |

| Natural Gas | Annual Usage | Daily Average load | Maximum Load (per hour only) |
|---|---|---|---|
| | MMBtu | MMBtu/d | MMBtu/h |
| Jan-24 | 1,267 | 11 | 1 |
| Jun-27 | 5,079 | 42 | 3 |
| Jun-29 | 10,980 | 92 | 7 |
| Jun-31 | 14,257 | 119 | 10 |
| Jun-34 | 16,623 | 139 | 11 |
| Required Delivery Date for Year 1 load | | | **6/1/2024** |
| 8" line required in place. | | | |

| WATER | | | |
|---|---|---|---|
| **Municipal Water** | Annual Usage | Daily Average load | Daily Peak Load |
| | gal (000's) | gal/d | gal/h |
| Jun-24 | 11,600 | 42,963 | 8,593 |
| Jun-27 | 46,500 | 172,222 | 34,444 |
| Jun-29 | 100,000 | 370,370 | 74,074 |
| Jun-31 | 130,000 | 481,481 | 96,296 |
| Jun-34 | 150,000 | 555,556 | 111,111 |
| Water quality required? | | | potable |
| Required Delivery Date for Year 1 volumes | | | 6/1/2024 |

| WASTEWATER TREATMENT | | | |
|---|---|---|---|
| **Wastewater** | **Annual Usage** | **Daily Average load** | **Daily Peak Load** |
| | gal (000's) | gal/d | gal/h |
| Jun-24 | 9,280 | 25,080 | 6,874 |
| Jun-27 | 37,200 | 101,320 | 27,556 |
| Jun-29 | 80,000 | 218,750 | 59,259 |
| Jun-34 | 104,000 | 342,350 | 77,037 |
| **Required Delivery Date** | 6/1/2024 | | |

| Effluent Characteristics | |
|---|---|
| **Parameter** | **Concentration (mg/L)** |
| BOD5 | 200 - 450 |
| TSS | 200 - 350 |
| It is not expected to have excess oils, fat or grease. No kitchen waste. | |
| Temperature will be less than 100 degrees F. | |
| Free from heavy metals and toxic substances | |

**<u>EXHIBIT E</u>**
**ROAD INFRASTRUCTURE**

Cul-de-sac for entrance to the Project Site on [], as set forth in the Company's final site plan.

## EXHIBIT F
## PAYMENTS IN LIEU OF TAX

1.    The Company and the Public Authorities anticipate the Company will make investment in two tranches, (a) beginning in calendar year 2024/2025 and ending in or before calendar year 2031/2032, and (b) beginning in calendar year 2031/2032 and ending in or before calendar year 2038/2039.

2.    Each tranche of the Project will receive a 20-year property tax savings incentive beginning in the year, for the applicable tranche, in which property becomes subject to *ad valorem* real/personal property tax (as described in item 4, below). To calculate the payments in lieu of tax owed by the Company pursuant to Section 8.4 of this Agreement, the Applicable Percentage for the beginning year of the respective tranche is to be multiplied by the taxable value of the fee interest of the Project in such year at and after the initial investment in that applicable tranche has become subject to *ad valorem* property tax.  The tax savings incentive to the Company is expressed in terms of the Abatement Percentage, *i.e.*, the percentage savings of the *ad valorem* real/personal property tax that would otherwise be due.

| Year | Applicable Percentage | Abatement Percentage |
|---|---|---|
| 1-10 | 0% | 100% |
| 11 | 9% | 91% |
| 12 | 18% | 82% |
| 13 | 27% | 73% |
| 14 | 36% | 64% |
| 15 | 45% | 55% |
| 16 | 54% | 46% |
| 17 | 63% | 37% |
| 18 | 72% | 28% |
| 19 | 81% | 19% |
| 20 | 90% | 10% |
| 21 and thereafter | 100% | 0% |

3.    The Company shall pay normal property taxes with respect to property not titled to the Authority, subject to other exemptions from taxation that may be available to the Company or as set forth in this Agreement otherwise.

4.    Year 1, for the initial tranche of Capital Expenditures invested with respect to the Project (Tranche 1 Capital Investment), shall be the calendar year commencing on the January 1 following the year in which commercial production commences (or Leased Property is otherwise "placed in service") for the Tranche 1 Capital Investment. During construction of the initial tranche of Project Improvements and prior to the commencement of commercial production, there shall be no *ad valorem* taxes or payments in lieu of tax payable with regard to the initial tranche.

5.    Year 1, for the additional tranche of Capital Expenditures invested with respect to the Project (Tranche 2 Capital Investment), shall be the calendar year commencing on the January 1 following the year in which commercial production commences (or Project is otherwise "placed in service") for the Tranche 2 Capital Investment. During construction of the additional tranche of Project Improvements and prior to the commencement of commercial production, there shall be no *ad valorem* taxes or payments in lieu of tax payable with regard to the additional tranche.

**<u>EXHIBIT G</u>**
**STATE INCENTIVES**
**[see attached]**



November 30, 2023

Ms. Ann Marie Collins
Savills
60 South 6th Street
Minneapolis, MN 55402

Dear Ms. Collins:

In today's global economy, we know your client can choose from many locations to establish their operations. On behalf of the Governor and the state of Georgia, we want to express our appreciation for considering Georgia as the home for Project Liberty. Our goal is for your client to be successful and prosperous in Georgia.

Georgia offers unique assets that set it apart nationally and internationally, and give Project Liberty the edge it needs to grow and compete.

**Pro-business climate**

- Georgia is ranked as the **No. 1 State for Doing Business** (10 years in a row) by *Area Development* magazine
- Effective January 2019, Georgia's corporate income tax rate is 5.75%.  Prior to this change, the state had a consistent 6% rate since 1969.
- Georgia's single factor apportionment and no 'throw-back' provision means significant savings for companies with substantial sales to customers outside Georgia.
- Georgia offers innovative incentives for businesses that locate or expand in the state.

**Outstanding logistics**

- Georgia's location means that 80% of the U.S. market is within a two-day truck haul, and its 5,000 miles of railroad and major rail yards comprise the largest network in the Southeast.
- Georgia's Port of Savannah is the third-busiest port gateway and fastest-growing container port in the U.S.
- Hartsfield-Jackson Atlanta International Airport offers connectivity throughout the world with more than 75 direct flights to five continents and over 150 domestic locations.




**Well-trained, educated workforce**

- In 2022, *Area Development* magazine named Georgia the **No. 1 Competitive Labor Environment** and the **No. 1 Leading Workforce Development Program** in the U.S. Georgia's **Quick Start** workforce training program is consistently ranked No. 1 by *Area Development.*
- Talent lives here: Each year Georgia attracts top graduates from the 1.5 million college students within 250 miles of Atlanta.
- Talent moves here: Georgia attracts talent from across the country; Georgia ranks 6th in the U.S. with 279,000 annual net migration.

Georgia will continue to have an outstanding business environment, one that supports growth and success. We have a growing workforce, a cost of living that is below the national average, and a great quality of life.

## GEORGIA STATUTORY INCENTIVES

Georgia offers several tax credits to reduce the potential Georgia corporate income tax liability of your operation. These tax credit programs are outlined below along with our other incentives, and their estimated values are based on the county under consideration.

The statutory incentive estimates in this letter are based on the following assumptions:

New Jobs to be created: 186

Private Investment to be made: $252,000,000

Average Wage for all employees: $65,000

Timeframe for jobs and investment: 10 years




**Overview of Statutory Incentives for Project Liberty**

| Incentive Program | Decatur County |
|---|---|
| **Georgia Tax Credits** | |
| Quality Job Tax Credits<br>*applicable to payroll withholding, once income tax liability exhausted* | $2,522,500<br><br>(Y4-Y5: 58 jobs x $4,000 credit x 5 years; Y6-Y9: 45 jobs x $4,500 credit x 5 years; Y10: 14 jobs x $5,000 credit x 5 years) |
| *Estimated Value of Statutory Incentives* | $2,522,500 |

**QUALITY JOBS TAX CREDIT**

In Decatur County, a company may be eligible for the Quality Jobs Tax Credit if it creates **at least 25 qualifying jobs** in Georgia within one year of the first date that the company withholds wages for employees in Georgia.

The following are the QJTC job creation thresholds for the communities under consideration:

| | Decatur County |
|---|---|
| Job Creation Threshold | 25 |
| Time Period for Creating Qualifying Jobs | 12 months |

A qualifying job is one that pays wages that are at least 110 percent of the county average. Eligible companies may receive a tax credit of $2,500 to $5,000 per job, per year, for up to five years, based on the scaled system below. To qualify, each job must be new to Georgia and:

- have a regular work week of 30 hours or more, and

- pay wages that are at least 110 percent of that county's average wage.

Only jobs that pay at or above 110% of the average wage of the county in which the job is located are eligible for the credit and can be included in the calculation of the company's average wage.

New quality jobs created within seven years can qualify for the credit. Credits may be used to offset the company's state payroll withholding once all other Georgia corporate income tax liability has been exhausted, and may be carried forward for 10 years. New jobs that do not meet the requirements for the Quality Jobs Tax Credit may count toward the Job Tax Credit program if they meet the eligibility requirements for that program separately.




For current average county wages, visit
https://explorer.gdol.ga.gov/vosnet/mis/current/ewcurrent.pdf

| Average Wage for All Qualifying Jobs (% of county average) | Credit Value per New Quality Job |
|---|---|
| ≥110% and <120% | $2,500 |
| ≥120% and <150% | $3,000 |
| ≥150% and <175% | $4,000 |
| ≥175% and <200% | $4,500 |
| 200% or greater | $5,000 |

**Quality Jobs Tax Credit Wage Thresholds as of June 2023**

| County | To Earn: | | | | |
|---|---|---|---|---|---|
| | $2,500 QJTC per job | $3,000 QJTC per job | $4,000 QJTC per job | $4,500 QJTC per job | $5,000 QJTC per job |
| | New jobs must pay at least this percentage of county weekly average wage: | | | | |
| | 110% | 120% | 150% | 175% | 200% |
| | Which equal the following thresholds for the counties under consideration:* | | | | |
| Decatur | $46,847 | $51,106 | $63,882 | $74,529 | $85,176 |

*As reported by the Georgia Department of Labor

**<u>Estimates</u>**

The following examples of Quality Job Tax Credits are estimates based on wage and job information provided to GDEcD by the company.

Quality Jobs Tax Credit: $2,522,500 (Y4-Y5: 58 jobs x $4,000 credit x 5 years; Y6-Y9: 45 jobs x $4,500 credit x 5 years; Y10: 14 jobs x $5,000 credit x 5 years)

<u>Estimate Details</u>

- 2024 (Year 1): Does not meet job minimum
- 2025 (Year 2): Does not meet job minimum
- 2026 (Year 3): Does not meet job minimum
- 2027 (Year 4): 34 jobs x $4,000 credit x 5 years




- 2028 (Year 5): 24 jobs x $4,000 credit x 5 years
- 2029 (Year 6): 12 jobs x $4,500 credit x 5 years
- 2030 (Year 7): 15 jobs x $4,500 credit x 5 years
- 2031 (Year 8): 9 jobs x $4,500 credit x 5 years
- 2032 (Year 9): 9 jobs x $4,500 credit x 5 years
- 2033 (Year 10): 14 jobs x $5,000 credit x 5 years
- *New job creation threshold not met after Year 10*

The example estimates above assume that the credit value will remain constant for the five years that credits are earned (if the jobs are maintained). The actual credit value will be recalculated each year based on the average salary of the qualifying jobs being claimed and the county average wage for the year in which the jobs were first created.

Process to Obtain Incentive

To claim the Quality Jobs Tax Credit, file a form IT-QJ with the Georgia income tax return at the time the return is filed. To use the credit to offset payroll withholding taxes, a Form IT-WH must be filed electronically with the Georgia Department of Revenue through the Georgia Tax Center within 30 days after the due date of the Georgia income tax return (including extensions) or within 30 days after the filing of a timely filed Georgia income tax return, whichever occurs first.

Requirements to Retain Incentive

If the number of new quality jobs falls below the minimum required to qualify (10, 25, or 50 jobs), the credit is not allowed for the year the number is below the minimum required to qualify. However, there is no recapture of the credit that has already been allowed.

The credits available to the company will therefore depend on which county is selected, the number of new jobs locating in that county, and the average wage of the new (qualifying) jobs. The credit value will be recalculated each year based on the average salary of the qualifying jobs being claimed and the county average wage for the year the jobs were created.

Incentive Program Requirements

The Quality Jobs Tax Credit is subject to program requirements as outlined in O.C.G.A. § 48-7-40.17. Rules published by the Georgia Department of Revenue in regulation 560-7-8-.51 have not been updated to reflect changes in the program resulting during the 2019 legislative session.

**INVENTORY TAX EXEMPTION**

Georgia's counties have the authority to enact Freeport Tax Exemption for local businesses through a referendum vote. The four classes of inventory defined by state law are:

• Class 1 - Raw materials and goods in process of manufacture

• Class 2 - Finished goods produced in Georgia within the last 12 months



• Class 3 - Finished goods stored in a Georgia warehouse, dock, or wharf within the last 12 months and destined for shipment out-of-state

• Class 4 – Finished goods stored in a Georgia e-commerce fulfillment center on January 1 destined to internet, phone or other remote purchasers, for no more than 12 months

| Class of Inventory | Decatur County |
|---|---|
| Class 1 | 100% for County |
| Class 2 | 100% for County |
| Class 3 | 100% for County |
| Class 4 | 100% for County |

In order to receive Freeport Tax Exemption, companies must file with the county Board of Tax Assessors each year by March 1st or April 1st, depending on the county.

In closing, we look forward to working with you to further define each of these incentives and its benefits to you.

Best Regards,

Kristi Brigman
Deputy Commissioner, Global Commerce

*Disclaimer: All information contained within this document should be considered an estimate and approximate value. Final determination of the value of tax credits, sales and use tax exemptions, and tax liability will be made by the Georgia Department of Revenue.*

